STATE OF NORTH CAROLINA v. RICKY LEE SANDERSON

No. 374A86(2)

(Filed 8 April 1994)

**1. Criminal Law § 410 (NCI4th) — murder — sentencing hearing — fairness — prosecutor's obligation**

It is the duty of the prosecutor, as much as it is of the trial judge, to uphold defendant's right to a fair hearing; it is especially important that the prosecutor refrain from improper conduct in the context of a capital sentencing hearing, where the issue before the jury is whether a human being should live or die and where this decision involves the exercise of the jury's judgment as to how certain aggravating and mitigating circumstances should be weighed against each other.

**Am Jur 2d, Trial §§ 189 et seq.**

**2. Criminal Law § 473 (NCI4th) — murder — sentencing hearing — prosecutorial misconduct — conduct toward opposing counsel**

The prosecutor in a first-degree murder resentencing hearing persistently engaged in improper conduct toward opposing counsel where he pointedly refused properly to address opposing counsel, often succeeded in preventing defendant's lawyers from finishing their sentences through continual interruptions,

1

directed comments to counsel rather than to the court, and these comments often contained angry denunciations or expressions of incredulity. It cannot be concluded that the abuse of counsel was harmless because the comments may have diminished defense counsel in the eyes of the jury and may have undermined the ability of defense counsel to provide effective representation by wearing down counsel.

**Am Jur 2d, Trial §§ 192 et seq., 307 et seq.**

3. **Criminal Law § 471 (NCI4th) — murder — sentencing hearing — prosecutorial misconduct — improprieties in cross-examination**

The prosecutor in a first-degree murder resentencing hearing employed abusive tactics in cross-examining defendant's principal expert witness, a clinical psychologist, by insulting and degrading the witness and attempting to distort her testimony. She was insulted, maligned, continually interrupted and bullied. It cannot be concluded that there was no prejudice because the net result may have been a less than complete, or a less than accurate, statement of her opinion.

**Am Jur 2d, Trial §§ 192 et seq., 307 et seq.**

4. **Criminal Law § 468 (NCI4th) — murder — sentencing hearing — prosecutorial misconduct — closing arguments**

The prosecutor during closing arguments in a first-degree murder resentencing hearing improperly misstated the evidence, suggested personal knowledge of inflammatory facts not of record, and placed before the jury an aggravating circumstance that the trial judge had specifically declined to submit.

**Am Jur 2d, Trial §§ 251 et seq.**

**Propriety and prejudicial effect of prosecuting attorney's arguing new matter or points in his closing summation in criminal case. 26 ALR3d 1409.**

**Propriety and prejudicial effect of prosecutor's argument to jury indicating that he has additional evidence of defendant's guilt which he did not deem necessary to present. 90 ALR3d 646.**

5. **Criminal Law § 473 (NCI4th) — murder — sentencing hearing — prosecutorial misconduct — prejudice**

The prosecutor's misconduct in a capital sentencing hearing, taken as a whole, deprived defendant of his due process

right to a fair sentencing hearing and the trial court's rulings did not deter the misconduct and did little to prevent it from influencing the jury.

**Am Jur 2d, Trial §§ 479 et seq.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 896.**

6. **Criminal Law § 1323 (NCI4th) — murder — sentencing — aggravating circumstances — avoidance of arrest — engaged in kidnapping — separate evidence**

The submission of the aggravating circumstances that a murder was committed to avoid arrest and while engaged in a kidnapping was not redundant because the circumstances were supported by different evidence. N.C.G.S. § 15A-2000(e)(4); N.C.G.S. § 15A-2000(e)(5).

**Am Jur 2d, Trial §§ 888 et seq.**

Justice MEYER concurring.

Justices MITCHELL and PARKER join in this concurring opinion.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a sentence of death imposed by John, J., presiding at the 20 May 1991 Special Criminal Session of Superior Court, Iredell County. Heard in the Supreme Court 12 April 1993.

*Michael F. Easley, Attorney General, by William N. Farrell, Jr., Senior Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, for defendant-appellant.*

EXUM, Chief Justice.

In April 1986, defendant pled guilty to first-degree kidnapping and first-degree murder of Sue Ellen Holliman and was sentenced to death. This Court overturned his sentence in *State v. Sanderson*, 327 N.C. 397, 394 S.E.2d 803 (1990), finding that the judge's instructions to the jury contained error under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). After a new sentencing proceeding, defendant was again sentenced to death. He now ap-

peals, raising numerous assignments of error. We conclude that the second sentencing proceeding was thoroughly tainted and defendant unfairly prejudiced by the prosecutor's improper conduct; therefore, we grant defendant a new sentencing proceeding.

I

At defendant's second sentencing proceeding, the State introduced a videotape of a confession he made some months after the crime. The substance of that confession was as follows. In need of money to supply his drug habit, defendant, on 14 March 1985, drove to the Supona area of Davidson County looking for a house to rob. He chose one that was surrounded by trees so he would not be seen. Parking his car in the driveway, he first tried the back door. Finding this door locked, he rang the bell and then returned to the front of the house. As he was opening the glass door, the inside door was opened by the victim, sixteen-year-old Sue Ellen Holliman, who had stayed home sick from school. Surprised to find the house occupied, defendant mumbled something about looking for a dog and then asked to use the phone. When he was refused, he barged inside and asked where the money was. Informed that there was no money in the house, defendant decided to "just get out of there" rather than search the house. He also decided to take the victim with him to prevent her from reporting his license plate number. Making sure not to leave any fingerprints, defendant led the victim out of the house, placed her · on the passenger-side floorboard of his car and drove away.

Defendant drove around with the victim in his car for over two hours trying to decide what to do with her. During this time, he injected drugs—for the second time that day. Finally, he decided to kill the victim and pulled off the road in a rural area outside Lexington. After injecting more drugs, he placed the victim in the trunk of his car and dug a grave. After again injecting drugs, he removed the victim from the trunk, choked her until she was unconscious and then stabbed her twice in the chest. Her shirt was up when he was stabbing her and her sweat pants got "drug down to her ankles" when later he dragged her by her hands to the grave. After burying her, he smoothed out the excess dirt to conceal the grave and drove home. On the way, he threw his knife in a creek.

By further testimony, the State showed the following. The victim's body was found on 15 April 1985, lying in a shallow grave

STATE v. SANDERSON

[336 N.C. 1 (1994)]

with clothing in disarray: T-shirt pulled up and bra partially torn, panties at mid-thigh, and sweat pants around the ankles. An autopsy revealed three stab wounds in the area of the sternum, no evidence of strangulation and no evidence of sexual molestation.

On 15 May 1985, Elwood "Woody" Jones, an employee of a business managed by the victim's family, confessed to the murder. His confession reflected details of the crime that had not yet been made public. He was later indicted for first-degree murder and was awaiting trial when defendant, who was then in prison for another crime, confessed to the same murder. The SBI then, for the first time, analyzed the victim's clothing and found carpet fibers and paint chips which matched samples taken from the passenger-side floor board and trunk of defendant's car. With this finding, the case was dismissed against Jones and proceeded instead against defendant.

Defendant presented evidence at the sentencing hearing tending to show the following. Defendant, the youngest of four children, lived with his family in Tarboro, N.C., for the first few years of his life. His parents fought frequently and his father beat his mother. When defendant was three, his mother took the children to Florida with another man. The family then moved to Texas, where the children were often left alone in the home at night. Soon the mother was jailed. The children spent a month in separate foster homes and were then returned to their father in North Carolina.

Upon their return, the father began raping defendant's six-year-old sister, Brenda. Brenda slept in the father's bed every night and was forced to have sex with him in many locations throughout the house, including on the couch and in the hallway, and quite often in view of defendant and the other children. These rapes were sometimes preceded by beatings, and continued until they resulted in Brenda becoming pregnant at the age of twelve. The children also witnessed the father making love with adult women.

The father regularly abused defendant's oldest brother, Douglas, stripping him and then beating him as hard as he could with electrical cords, all the while asking defendant whether he should beat Douglas harder. Defendant witnessed "thousands" of such beatings. Though he was not beaten himself, he was punished, along with the other children, by being made to kneel in a corner with his hands behind his back for five to six hours at a time.

STATE v. SANDERSON

[336 N.C. 1 (1994)]

There were no family meals, and seldom was there store-bought food in the house. The children bought food for themselves with the money they made from mowing lawns, but also had to resort to stealing chickens and raiding gardens. Because the father did not provide them with clothing, the children wore rags they found or whatever clothes people gave them. The father remarried at one point, but the marriage lasted only two weeks.

Defendant was ten years old when his father was convicted of incest and sentenced to fifteen years in prison. After spending two years in a foster home, he was reunited with his mother and siblings in Texas. Having by this time developed behavior problems, defendant was in desperate need of affection from his mother. She responded by breaking "belt after belt" on him and threatening to kick him out of the house or force him to go live with his father.

By the age of thirteen or fourteen, defendant was "heavily" into substance abuse. He started injecting drugs two years later. This habit, a way of coping with the pain and neglect of his childhood, continued. By the time of the murder, when defendant was twenty-five or twenty-six, he was injecting an amphetamine called "crank" every three or four hours. This drug, which impairs good judgment and creates paranoid and erratic thinking, caused a profound behavioral change in defendant. He stopped going home to his wife, stopped working every day and started gambling. He also started acting "radical . . . and just feisty," according to his brother Douglas. Given the frequency of his drug use, he would have been acutely intoxicated at the time he killed Sue Ellen Holliman and experiencing "irresistible impulses." By contrast, when interviewed in prison several years later by an expert on forensic psychiatry and addictionology, he demonstrated none of the mental defects associated with his previous addiction.

At the time of the killing, defendant was also suffering from a mental and emotional disturbance secondary to his violent and deprived childhood. This disturbance contributed significantly to his violent behavior.

Once in prison, defendant became deeply interested in religion. He met with The Reverend Derry Barnhardt on numerous occasions and corresponded with him regularly for five years. He had many religious discussions with the chaplain of Central Prison, participated in several of the chaplain's seminars, and was ultimately selected with only six others to undergo six months of discipleship training

in the Master Life Program. Defendant was a positive influence on the other men in his cell block, never engaging in misconduct, and tried to bring religion into their lives. He continually expressed deep feelings of remorse about his crime, but never blamed anyone but himself.

At the close of the evidence, the jury found beyond a reasonable doubt the existence of two aggravating circumstances: 1) that the murder was committed for the purpose of avoiding lawful arrest, and 2) that the murder was committed while the defendant was engaged in the commission of a kidnapping. Of the thirty-one mitigating circumstances submitted, one or more jurors found only one: that the defendant's confession was responsible for the release from custody of an innocent man who had been charged with the murder. The jury found this mitigating circumstance insufficient to outweigh the aggravating circumstances, and the aggravating circumstances sufficiently substantial, when considered with the found mitigating circumstance, to call for the imposition of the death penalty. Upon this recommendation, the judge sentenced defendant to death.

## II

Defendant contends, and we agree, that his death sentence cannot stand because the prosecutor's persistent misconduct deprived him of a fair sentencing hearing. Because the trial court allowed much of it to go uncorrected, and because the jury almost totally rejected defendant's evidence in mitigation, we cannot assume that the prosecutor's misconduct was without effect on the jury. We, therefore, order a new sentencing proceeding.

### A. Prosecutor's Duty to Ensure Fair Trial

[1] "Every person charged with a crime has an absolute right to a fair trial. By this it is meant that he is entitled to a trial before an impartial judge and an unprejudiced jury in keeping with substantive and procedural due process requirements of the Fourteenth Amendment." State v. Britt, 288 N.C. 699, 710, 220 S.E.2d 283, 290 (1975); accord State v. Levitt, 36 N.J. 266, 270, 176 A.2d 465, 467 (1961) (defendant has right to trial in which jury's decision is " 'obedient to the court's charge based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences' ") (quoting Wright v. Bernstein, 23 N.J. 284, 294-95, 129 A.2d 19, 25 (1957) ). This

right exists "regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." *Irvin v. Dowd*, 366 U.S. 717, 722, 6 L. Ed. 2d 751, 755 (1961).

Our courts have consistently held that it is the duty of the prosecutor, as much as it is of the trial judge, to uphold the defendant's right to a fair hearing. *See State v. Barfield*, 298 N.C. 306, 331, 259 S.E.2d 510, 530-31 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980); *Britt*, 288 N.C. at 710-11, 220 S.E.2d at 291-92; *State v. Miller*, 288 N.C. 582, 598, 220 S.E.2d 326, 337 (1975); *State v. Westbrook*, 279 N.C. 18, 38, 181 S.E.2d 572, 583-84 (1971), *vacated on other grounds*, 408 U.S. 939, 33 L. Ed. 2d 761 (1972); *State v. Phillips*, 240 N.C. 516, 522, 82 S.E.2d 762, 766 (1954). As stated in the oft-quoted case of *Berger v. United States*:

> The [prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

295 U.S. 78, 88, 79 L. Ed. 2d 1314, 1321 (1935). "The district attorney's performance of his duties as public prosecutor is tempered by his obligation to the defendant to assure that he is afforded his right to a fair trial." *Barfield*, 298 N.C. at 331, 259 S.E.2d at 531.

That a prosecutor refrain from improper conduct is especially important in the context of a capital sentencing hearing, where the issue before the jury is whether a human being should live or die and where this decision involves the exercise of the jury's judgment as to how certain aggravating and mitigating circumstances should be weighed against each other. *See Caldwell v. Mississippi*, 472 U.S. 320, 323, 86 L. Ed. 2d 231, 236 (1985) (Eighth Amendment imposes "heightened 'need for reliability in the determination that death is the appropriate punishment . . .'"); *see also Hance v. Zant*, 696 F.2d 940, 951 (11th Cir.) (In capital case, "it is most

important that the sentencing phase of the trial not be influenced by passion, prejudice, or any other arbitrary factor. [Citation omitted]. With a man's life at stake, a prosecutor should not play on the passions of the jury"), *cert. denied*, 463 U.S. 1210, 77 L. Ed. 2d 1393 (1983); N.C.G.S. § 15A-2000(d)(2) (1988) (death sentence may not stand if "imposed under the influence of passion, prejudice, or any other arbitrary factor").

### B. *Conduct Toward Opposing Counsel*

[2] The prosecutor persistently engaged in improper conduct toward opposing counsel, Mr. McMillan and Ms. Simon. He pointedly refused properly to address Mr. McMillan, referring to him derisively either as "McMillan" or "Lawyer Mac Millan."[1] He responded to Ms. Simon's suggestion that a prospective juror was hard of hearing by saying, "Maybe he just doesn't care what you're talking about." When Mr. McMillan incorrectly stated that the defense had used only nine peremptory challenges, the prosecutor said, "You been asleep, McMillan." Later, he said, "Do you want to learn how to read?! 5 and 7 is what she says that she did not object to. Do you object to them, Lawyer M—a—c Millan?!" And when Mr. McMillan strenuously objected to a clearly improper line of questioning, the prosecutor retorted, "You're getting your exercise, Lawyer Mac Millan."

The prosecutor also, through continual interruptions, often succeeded in preventing defendant's lawyers from finishing their sentences. Moreover, he directed comments—styled as objections or points of law—to counsel rather than to the court. These comments often contained angry denunciations or expressions of incredulity. For instance, the following occurred when the prosecutor learned that neither of defendant's expert witnesses had prepared written reports.

MR. ZIMMERMAN: If your Honor please, let me just say for the record, there's all this talk about what's right and what's proper, and what's—and this fellow who is a psychiatrist is also a lawyer, and that's exactly why they don't prepare any written report. Because you know you won't have to give me

---

1. "Well, speak up, McMillan!"; "Ha! . . . Why don't you say that in front of the jury, McMillan"; "And McMillan looks at me and says . . ."; "And you said that Lawyer Mac Millan over here called you back in February . . . ."

one when he testifies and—so I'll know what he's testifying from. And!! that!!—

MR. MCMILLAN: Your Honor!!

MR. ZIMMERMAN: —does not seem to me to be fair!!! (Mr. Zimmerman has directed this comment toward Mr. McMillan.)

MR. MCMILLAN: Your Honor, would you please have Mr. Zimmerman address the Court?

THE COURT: I have asked you all to address the Court and I do ask you again—

MR. ZIMMERMAN: Yes, sir.

THE COURT: —Mr. Zimmerman, to address the Court.

Later, the prosecutor described a defense motion as "the biggest bunch of hogwash I ever heard!" and called defendant's lawyers "cowards!" Also, he responded to an objection made by Mr. McMillan during cross-examination of a defense witness by saying, "I'm sick and tired of him jumping up and running his mouth at a point in time when there's been absolutely nothing said that's improper . . . ."[2]

It is well-established that a trial attorney may not make uncomplimentary comments about opposing counsel, and should "refrain from abusive, vituperative, and opprobrious language, or from indulging in invectives." *State v. Miller*, 271 N.C. 646, 658-59, 157 S.E.2d 335, 346 (1967). *See also* Rule 12, Superior and District Court Rules (1993) ("All personalities between counsel should be avoided. The personal history or peculiarities of counsel on the opposing side should not be alluded to. Colloquies between counsel should be avoided.").

While acknowledging the impropriety of the prosecutor's behavior, the State argues that this behavior was harmless on

---

2. The prosecutor also engaged in what may be best described as gamesmanship. He responded to the court's ruling prohibiting him from eliciting certain testimony on direct examination by saying, "No, I might just put Captain Johnson up there and ask him to tell about it anyway!" Later, when defense counsel moved for a mistrial on the ground that the prosecutor had purposely attempted to elicit testimony already declared inadmissible by the court, the prosecutor first *joined* the motion then recanted, having in the interim held forth at length about the unfairness of having to "try the case with one hand tied behind your back."

the ground that much of it occurred out of the presence of the jury. Though it is true that many of the prosecutor's abusive comments were made outside the jury's hearing, many were made within its hearing. These comments—particularly the derisive references to Mr. McMillan—certainly had the potential to bias the jury against defendant's counsel and, thereby, prejudice his case. Of no less concern, however, is the effect the prosecutor's conduct may have had on defendant's counsel. Indeed, the prosecutor's abuse, if not designed to do so, at least had the effect of wearing them down, or, as defendant put it in his brief, of making it "so painful for [them] to do their jobs that they would do less."

Halfway through the hearing, Mr. McMillan indicated to the court that, "I've never been through anything like this before and I'm getting exhausted of trial by insult . . . ." Near the end of the hearing, after one of the prosecutor's more vehement tirades, Ms. Simon was reduced to tears. She told the judge: "I'm . . . nauseated to the pit of my stomach. I don't know if the Court has been able to tell, but I've lost a tremendous amount of weight during this trial. I do not sleep, I cannot eat." She indicated further that, though she would not allow herself to be "beaten down" by the prosecutor, the trial of defendant's case had caused her "considerable pain" such that she fully intended never again to try a capital case.

Thus, we cannot conclude that the prosecutor's abuse of defendant's counsel was harmless. Those comments made before the jury may have diminished defendant's counsel in the eyes of the jury. The prosecutor's entire course of conduct, including the comments he made out of the presence of the jury, may have undermined the ability of defendant's counsel to provide effective representation.

### C. *Improprieties in Cross-Examination*

[3] The prosecutor employed similarly abusive tactics in cross-examining defendant's principal expert witness, Dr. Faye Sultan, a clinical psychologist. He insulted her, degraded her, and attempted to distort her testimony, all in violation of well-settled rules governing cross-examination. Unfortunately, the trial court did not do enough to protect her.

From the start, the prosecutor undertook to discredit Dr. Sultan through insults and unwarranted personal attacks rather than through legitimate cross-examination. He opened his cross-examination with the following:

Q. Mrs. Sultan?

(No response from the witness.)

Q. Mrs. Sultan; is that right?

A. No, sir.

Q. Ms. Sultan?

(No response.)

Q. Dr. Sultan, did you . . .

This tactic, which conveyed the impression that the witness was not worthy of respect as a professional, was employed repeatedly. During the course of his questioning, the prosecutor referred to Dr. Sultan as "that lady," "this gal," and even "dear."

After Dr. Sultan indicated that she could not name, off the top of her head, the many diagnostic scales of a test she had administered to defendant, the prosecutor asked her: "Ma'am, did you go to school to learn to be a psychologist?!!" The court over-ruled defendant's objection. Later in the same line of questioning, the prosecutor stated: "Well, I know about as much as this gal does." Though the court did instruct the jury to disregard this comment, the prosecutor was undeterred. Shortly thereafter, he suggested that Dr. Sultan's testing methods were akin to "having a crystal ball" and asked: "You don't wear a cape or anything or one of them pointed hats and do kind of voodoo around it and something comes up and . . . just tells you what the theme is; do you?" Again, the trial court responded with a weak instruction.

This sort of personal abuse has no place in cross-examination. As we have long held, a witness " 'should not be subjected unjustly to abuse, which is calculated to degrade him or to bring him into ridicule or contempt.' " Lamborn v. Hollingsworth, 195 N.C. 350, 353, 142 S.E. 19, 21 (1928) (quoting Massey v. Alston, 173 N.C. 215, 225, 91 S.E. 964, 968 (1917)); see also Phillips, 240 N.C. at 528, 82 S.E.2d at 771 ("the law forbids the prosecuting attorney to put to a witness for the defense an impertinent and insulting question which he knows or should know cannot possibly elicit

STATE v. SANDERSON

[336 N.C. 1 (1994)]

any competent or relevant testimony"). The prosecutor's questions were not designed to elicit competent evidence. More in the nature of rhetorical assertions, their likely effect was unfairly to prejudice the jury against this witness.

The prosecutor also attempted to distort Dr. Sultan's testimony. He insisted on yes or no answers to compound, convoluted questions, then cut her off before she could explain. For instance:

Q. Well, I'm kind of interested in that because like these other tests—who is it that tells you that somebody else didn't tell him the answers, or answer it for him, or was laughing while he was doing it, or was crying while he was doing it? You don't know, yourself, any of those things; do you?

A. No, sir, I do not. I trust my exam—

Q. Thank you.

MR. MCMILLAN: Please, finish—let her finish!

MR. ZIMMERMAN: Oh, yes, she can answer!

By this technique, the prosecutor sometimes mischaracterized the meaning of the answer given, as in the following exchange:

Q. Well, when somebody is projecting something into something—I'm projecting myself into something, okay? Would not it be nice for you to be there to see how I projected, rather than have some clinician do it? Isn't the way the man reacts, or the woman reacts to what they're projecting, isn't that something that any good psychologist would consider; isn't it?

A. No, sir, they—

Q. Oh, they don't consider how you react?! You—

A. I'd like to finish my answer.

Q. Just a minute.

MR. MCMILLAN: She's entitled to finish her answer, Your Honor.

MR. ZIMMERMAN: Just a minute.

Q. You're telling me that how somebody reacts to these projections in these two tests is not, not—help you form an opinion about your themes and thoughts?

A. No, sir, I wasn't telling you that at all.

Q. Well, tell me, does it make a difference then how he reacts to it?

A. The answer depends entirely upon how you're going to use the material that's elicited. It was—

Q. Well, very obviously—

MR. McMILLAN: Your Honor, please let her finish her answer.

MR. ZIMMERMAN: Go ahead.

By posing questions which assumed facts not in evidence, the prosecutor succeeded in testifying to his own knowledge or beliefs through the witness. For instance, though there was no evidence that Dr. Sultan had been present in the courtroom during the testimony of defendant's brother, the prosecutor nonetheless queried: "I could basically tell you what his profile was after hearing his brother testify. And that's exactly what you did, parrot what his brother said; isn't that right?" With this sort of question, the very asking of it sufficed to convey the prosecutor's personal opinion to the jury, regardless of the witness' answer.

Though leading questions are entirely appropriate in the cross-examination of an adverse witness, N.C.G.S. § 8C-1, Rule 611(c) (1992), the questioner may not distort the witness' testimony by purposely misconstruing answers and cross-examining the witness on the basis of the misconstruction. *Berger*, 295 U.S. at 84, 79 L. Ed. 2d at 1319; *see also* Rule 12, Superior and District Court Rules ("Counsel shall *not knowingly misinterpret* . . . the testimony of a witness"). Nor may the cross-examiner inject into questions "his own knowledge, beliefs, and personal opinions not supported by the evidence." *Britt*, 288 N.C. at 711, 220 S.E.2d at 291. The prosecutor is not a sworn witness subject to cross-examination. His personal knowledge and opinions are therefore incompetent. *See Phillips*, 240 N.C. at 524, 82 S.E.2d at 767-68.

The State argues that the prosecutor's questioning, though inappropriate, did not result in prejudice to defendant because

Dr. Sultan ultimately succeeded in giving a complete answer to every question and in correcting any misimpressions. We are not persuaded by this argument. The prosecutor managed to distort Dr. Sultan's testimony on several occasions without provoking curative instructions. In the absence of such instructions, that Dr. Sultan strove to correct the record herself does not negate the possibility that the jury chose to accept the prosecutor's distortions. Furthermore, we do not assume that the prosecutor's improper behavior had no chilling effect on the witness. She was insulted, maligned, continually interrupted and bullied. Though she weathered it all with considerable fortitude, the net result may still have been a less than complete, or less than accurate, statement of her opinion. Thus, we cannot conclude that the prosecutor's improper conduct toward this witness caused no prejudice to defendant.

### D. *Improprieties in Closing Argument*

[4] During closing argument, the prosecutor misstated the evidence, suggested personal knowledge of inflammatory facts not of record and placed before the jury an aggravating circumstance that the trial judge had specifically declined to submit. Again, the trial court's response to these abuses was inadequate to guard against the potential for prejudice.

In both the guilt-innocence and the sentencing phases of a capital trial, counsel is permitted wide latitude in his argument to the jury. *Britt*, 288 N.C. at 711, 220 S.E.2d at 291 (guilt phase); *State v. Johnson*, 298 N.C. 355, 368-69, 259 S.E.2d 752, 761 (1979) (sentencing phase). He may argue the facts in evidence and all reasonable inferences therefrom as well as the relevant law. "Language may be used *consistent with the facts in evidence* to present each side of the case." *Britt*, 288 N.C. at 711, 220 S.E.2d at 291; *see also* N.C.G.S. § 15A-1230(a) (1988). Jury argument, however, is not without limitations. As we stated in *Britt*: " 'The trial court has a duty, upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury. If the impropriety is gross it is proper for the court even in the absence of objection to correct the abuse *ex mero motu*.' " 288 N.C. at 712, 220 S.E.2d at 291 (quoting *State v. Monk*, 286 N.C. 509, 516, 212 S.E.2d 125, 131 (1975) ). In the context of a capital sentencing hearing, counsel's argument must also comport with the requirements of the capital

sentencing statute, N.C.G.S. § 15A-2000 (1988). *See State v. Jones*, 296 N.C. 495, 500-03, 251 S.E.2d 425, 428-29 (1979).

The prosecutor often disregarded these limitations. First, he distorted the evidence. In addressing the proposed mitigating circumstance that the crime was committed while defendant was under the influence of a mental or emotional disturbance, the prosecutor proclaimed it "a bunch of hogwash" and stated: "There've been plenty of people and you heard what the psychologist said, 'Yeah, there are about 10,000 folks in the county that are walking around with borderline—[defendant objects]—personality syndrome.' " In fact, Dr. Sultan had specifically rejected this contention on cross-examination:

Q. A borderline personality disorder. Are there fully ten to fifteen thousand people right here in Iredell County that suffer from that; aren't there?

A. No, sir.

Q. This isn't any serious problem, is it?

A. Yes, sir, it is a quite serious problem.

Q. And you're saying that that problem right there is not suffered by a large number of people in the population today . . . ?

A. Yes, sir, there are many people who have, who would fall in these categories, yes.

The trial court should have sustained defendant's objection and instructed the jury to disregard the erroneous statement. *Britt*, 288 N.C. at 712, 220 S.E.2d at 291. Instead, the trial court overruled defendant's objection and simply advised the jury to "remember my instructions," i.e., that the statements of counsel were not evidence. This ruling could have left the impression that the jury was free to accept the prosecutor's incorrect version of Dr. Sultan's testimony. The jury may well have done so as it rejected the mitigating circumstance at issue.

Second, the prosecutor insinuated personal knowledge of facts not in evidence. In addressing the fourth proposed mitigating circumstance, the prosecutor stated:

Number Four: 'At the time he confessed he was not a suspect in the murder of Sue Ellen Holliman.' Well, at the time he

confessed, that's right. I submit to you that the evidence was there in the SBI Laboratory to convict him. And until that person came down there [to the prison] and talked to him, that's right, he was not a suspect in **that** killing.

MS. SIMON: Objection.

MR. McMILLAN: Objection!

THE COURT: Overruled.

MR. ZIMMERMAN: Thank you.

THE COURT: Again, remember my instruc—

MR. McMILLAN: There is no other killing, Your Honor.

MR. ZIMMERMAN: Well, you've just brought it up. I just said that killing.

THE COURT: Members of the Jury, don't consider this as referring to any other killing. Go ahead, Mr. District Attorney.

The prosecutor's insinuation was without support in the record. It was also erroneous. The defendant had not been a suspect in another murder.

The State argues that the prosecutor's reference to "**that** killing" was entirely innocent and that he did not intend to suggest the existence of another murder. Even if innocent, the effect on the jury was the same. Given the prosecutor's special emphasis on the word "that," which appears in the trial transcript itself, the statement clearly implies that the defendant, though not a suspect in the murder of Sue Ellen Holliman, **was** a suspect in another murder. We note, too, that this was not the first time the prosecutor had made such an insinuation. During his case-in-chief, the prosecutor questioned Sheriff Jim Johnson about a photograph of defendant's car as follows:

Q. And so the jury will understand this State's [exhibit] 17, the car, we had not had State's 17 in our possession at any time prior to that, with reference to this particular homicide; is that right?

A. Yes, sir.

Q. It wasn't until after Mr. Sanderson had confessed—

STATE v. SANDERSON

[336 N.C. 1 (1994)]

MR. MCMILLAN: Your Honor, I'm going to object to the phrase, "this particular homicide."

MR. ZIMMERMAN: Well, let me finish my question.

THE COURT: Well, disregard "this particular homicide," Members of the Jury. Go ahead, Mr. District Attorney.

MR. ZIMMERMAN: Well, we're only talking about one homicide so—but it's this one as opposed to some other one.

THE COURT: Disregard that, Members of the Jury. Just ask your question please, Mr. Zimmerman.

Also, the jury knew facts which, with the prosecutor's argument, could have caused it to believe that defendant had in fact committed another murder. The jury knew that defendant had been in jail at the time he confessed, but not for the murder of Sue Ellen Holliman. Thus, it knew he had committed, or at least been charged with, another crime. It was in this context that the prosecutor twice insinuated that the other crime was a killing. Upon these statements, the trial court neither confirmed nor denied the prosecutor's insinuation, stating merely, "don't consider this as referring to any other killing." The jury being left with a plausible suggestion that defendant had committed at least one other murder and a mild instruction from the judge not to consider it as such, it may well have accepted the prosecutor's suggestion and been influenced by it in its sentencing determination. We are instructed in this conclusion by the words of Mr. Justice Sutherland:

> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations [of fairness], which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

Berger, 295 U.S. at 88, 79 L. Ed. 2d at 1321.

The State argues that the improprieties in the prosecutor's statements were cured by the trial court's prompt instruction. We are not persuaded by this argument. This Court has held that some forms of misconduct are so inherently prejudicial that they may not be considered "cured" even though the trial court has given a strong corrective instruction. In Britt for instance, a case

involving a capital murder trial, the prosecutor insinuated during cross-examination that the defendant had already once been convicted of first-degree murder for the same crime. 288 N.C. at 707-08, 220 S.E.2d at 288-89. Though the trial court sustained the defendant's objection and twice instructed the jury to disregard the defendant's prior conviction and focus solely on the evidence adduced, we held that, "no instruction by the court could have removed from the minds of the jurors the prejudicial effect that flowed from knowledge of the fact that defendant had been on death row as a result of his prior conviction of first degree murder in this very case." *Id.* at 713, 220 S.E.2d at 292.

As in *Britt*, we do not believe the prosecutor's misstatements could have been cured by the trial court's instruction. If the jury believed that defendant had committed another murder, or perhaps several other murders, it must necessarily have considered him not only more culpable but also more of a threat to society. In such case the prosecutor's repeated contention, "[t]he only way you can be sure that he'll never do this again . . . is to give him death," would have appeared even more compelling.

The prosecutor also made improper use of the evidence that defendant said he raped his victim before killing her. The evidence adduced was as follows. Defendant's brother testified on cross-examination that defendant had told him he raped the victim but had not gone into how he raped her. Defendant's brother also read aloud a religious tract written by defendant from prison. The tract, which described defendant's journey from sinner to convert, contained the following statement: "I also started going to pornographic movies and tried to fill the sex drive these drugs would give me. One day I broke into a house and a girl was home. I found myself in a place where I could act out all the rape scenes I had been watching in these movies, I did on this girl." Later, Dr. Sultan testified on direct that defendant had told her he raped the victim. Casting doubt on defendant's claim was the autopsy report, which showed no evidence of sexual molestation whatsoever.

At the close of the evidence, the trial court determined that it would submit only two aggravating circumstances to the jury: 1) that the murder was committed for the purpose of avoiding lawful arrest, and 2) that the murder was committed while the defendant was engaged in the commission of a kidnapping. In addition, the court specifically refused the prosecutor's request that

it submit rape as a third aggravating circumstance, undoubtedly because of the lack of forensic evidence supporting this circumstance. Despite this ruling, the prosecutor asserted on three separate occasions during his closing argument that the defendant deserved to die, at least in part, because he had raped the victim. This line of argument was improper. As we stated in *State v. Zuniga*, 320 N.C. 233, 267, 357 S.E.2d 898, 919, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), counsel may not in his argument "attempt to put before the jury a[n aggravating] factor that the trial court ha[s] found not to be supported by the evidence." Though the argument called for stern rebuke and prompt curative instructions, *Britt*, 288 N.C. at 712, 220 S.E.2d at 291; *see also Berger*, 295 U.S. at 85, 79 L. Ed. 2d at 1320, the trial court overruled defendant's objections and merely instructed the jury to "take the facts from your own recollection of the evidence." The jury was presumably left with the impression that it could consider rape in aggravation of the murder.

### E. *Prejudice to Defendant*

[5] We conclude that the prosecutor's conduct, taken as a whole, deprived defendant of his due process right to a fair sentencing proceeding. The trial court's rulings did not deter the misconduct, and did little to prevent it from influencing the jury. Despite defendant's evidence in mitigation, the jury found the existence of only one of the thirty-one submitted mitigating circumstances. We note that the jury in the first sentencing proceeding found four of six submitted mitigating circumstances. Three of those found were among the circumstances rejected by the jury in the second sentencing hearing. We conclude that the prosecutor's misconduct resulted in a denial of " 'that fundamental fairness essential to the very concept of justice.' " *Donnelly v. De Christoforo*, 416 U.S. 637, 642, 40 L. Ed. 2d 431, 436 (1974) (quoting *Lisenba v. California*, 314 U.S. 219, 236, 86 L. Ed. 166, 180 (1941)).

### III

[6] We now address one further issue raised by the parties since it is likely to arise again at defendant's new sentencing hearing.

Defendant argues that, under the rule announced in *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987), *cert. denied*, 373 S.E.2d 554 (1988), the trial court should not have permitted the jury to find as separate statutory aggravating circumstances that

STATE v. SANDERSON

[336 N.C. 1 (1994)]

the murder was committed for the purpose of avoiding lawful arrest, N.C.G.S. § 15A-2000(e)(4), and that the murder was committed while the defendant was engaged in a kidnapping, N.C.G.S. § 15A-2000(e)(5). According to defendant, these circumstances were redundant. We do not agree.

In *Quesinberry*, we held that the trial court erred in submitting the aggravating circumstances 1) that the murder was committed during the course of a robbery and 2) that the murder was committed for pecuniary gain. Because the evidence showed that the defendant committed the robbery for the purpose of pecuniary gain, as opposed to some other purpose, the circumstances were redundant. 319 N.C. at 238, 354 S.E.2d at 452. In effect, the trial court permitted the jury to use the same evidence—that the defendant killed for pecuniary gain—to aggravate the murder twice. *Id.* at 239, 354 S.E.2d at 452-53.

The trial court's submission of (e)(4) and (e)(5) in the case at bar did not violate *Quesinberry*. The evidence underlying these circumstances was not the same. The (e)(4) circumstance was based on the evidence that the murder itself was effected for the purpose of avoiding lawful arrest. The (e)(5) circumstance was based on the evidence that the murder occurred during the commission of a kidnapping. Because these circumstances were supported by different evidence, they cannot be considered redundant. *See State v. Jennings*, 333 N.C. 579, 627-28, 430 S.E.2d 188, 213-14, *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 602 (1993) (held: aggravating circumstances will not be considered redundant absent "complete overlap" in the evidence supporting them).

IV

Having found that the prosecutor's persistent misconduct deprived defendant of his right to a fair hearing, we vacate his death sentence and remand for a new capital sentencing proceeding.

Because the jury found the existence of both submitted aggravating circumstances, *see State v. Silhan*, 302 N.C. 223, 270, 275 S.E.2d 450, 482-83 (1981), and because these circumstances were not redundant, we hold that they may be resubmitted at the next sentencing proceeding.

DEATH SENTENCE VACATED; REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.

Justice MEYER concurring.

I concur with the majority that the sum of all the prosecutor's statements and actions warrants a new sentencing proceeding in this case. I wish to make it clear, however, that I do not attribute the conduct of the prosecutor to any intentional course of conduct on his part. I consider the actions and statements of the prosecutor to be a natural, though unrestrained, manifestation of the high emotion of this capital trial.

The majority opinion, of necessity, addresses and examines only examples of conduct on the part of the prosecution in this case that represent a crossing of the line of fairness. I fear, however, that in focusing our attention so carefully on these incidents only and in our failure to allude to any example of propriety or fairness exhibited by the prosecutor, it may appear to the reader that this Court believes that the prosecutor intentionally engaged in a bad faith effort to subvert the fairness of the trial. I do not believe that this was the case.

Justices MITCHELL and PARKER join in this concurring opinion.