An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1307

NORTH CAROLINA COURT OF APPEALS

Filed: 19 August 2014

STATE OF NORTH CAROLINA

v.

ROGER DALE HONEYCUTT,
    Defendant.

Mecklenburg County
Nos. 10CRS250187-89
    12CRS201338-39, 41


Appeal by defendant from judgments entered 22 February 2013 by Judge Jesse B. Caldwell in Superior Court, Mecklenburg County. Heard in the Court of Appeals 24 April 2014.

> *Attorney General Roy A. Cooper, III, by Special Deputy Attorney General K. D. Sturgis, for the State.*

> *Kimberly P. Hoppin, for defendant-appellant.*

STROUD, Judge.

Defendant appeals judgments for two counts of first degree burglary, two counts of second degree rape, and two counts of second degree sexual offense. For the following reasons, we find no error.

I.    Background

The State's evidence tended to show that in 1981 two rapes occurred within a month of each other, both involving white females in the same part of town sleeping on couches at night in first floor apartments. Both women identified the perpetrator as a Caucasian male and both believed he entered through a sliding glass door. One woman, Cheryl,[1] said that the man performed cunnilingus on her and then had vaginal intercourse with her. Cheryl called the police and had a sexual assault examination at the hospital. The other woman, Lyla, was forced to perform fellatio on the man, and then he had vaginal intercourse with her. Lyla went to the hospital where she received a sexual assault examination.

Many years later, Lyla's sheet and both women's rape kits were tested for DNA. The DNA on Lyla's sheet and rape kit "matched" defendant's DNA; Lyla's sheet had a DNA match probability with defendant of one in 730 billion Caucasians, and her rape kit had a match probability with defendant of one in 36.2 billion Caucasians. Cheryl's rape kit was consistent with defendant with a match probability of one in 16.2 million Caucasians. Defendant was tried by a jury and found guilty of two counts of first degree burglary, two counts of second degree

---

[1] Pseudonyms will be used to protect the identity of the individuals involved.

rape, and two counts of second degree sexual offense. The trial court entered judgments on the convictions, and defendant appeals.

## II. Lyla's Sheet and Rape Kit

Defendant makes a lengthy argument that the trial court erred by admitting evidence of Lyla's sheet and rape kit. Most of defendant's arguments are recitations of the facts or statements of law without analysis as to how they affect his case. For example, defendant notes that the doctor who collected the rape kit from Lyla "did not have any independent recollection of [Lyla] or of the events of February 21, 1981" and that he based his testimony upon the documentation on the rape kit which bore his signature, and the bag which held the sheet "was now 'tattered.'" Of course, the other witnesses likewise lacked independent recollection of their handling and testing of the DNA evidence back in 1981 and relied upon the documentation. In the end, defendant essentially contends Lyla's sheet and rape kit were not "sufficiently identified or authenticated" because the State failed to prove that the evidence was not contaminated or materially changed.

As defendant failed to object at trial, we review the admission of the evidence regarding the sheet and rape kit for

plain error. *See State v. Harding,* 110 N.C. App. 155, 161, 429 S.E.2d 416, 420 (1993) ("Due to defendant's failure to object at trial, we must review this objection under the plain error rule.")

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citations, quotation marks, and brackets omitted). Furthermore, our Supreme Court has established that "[a] prerequisite to our engaging in a plain error analysis is the determination that the instruction complained of constitutes error at all." *State v. Torain*, 316 N.C. 111, 116, 340 S.E.2d 465, 468 (quotation marks omitted), *cert. denied*, 479 U.S. 836, 93 L.Ed. 2d 77 (1986).

> This Court has stated that a two-pronged test must be satisfied before real evidence is properly received into evidence. The item offered must be identified as being the same object involved in the incident and it must be shown that the object has undergone no material change. The trial court possesses and must exercise sound

> discretion in determining the standard of certainty that is required to show that an object offered is the same as the object involved in the incident and is in an unchanged condition. A detailed chain of custody need be established only when the evidence offered is not readily identifiable or is susceptible to alteration and there is reason to believe that it may have been altered. Further, any weak links in a chain of custody relate only to the weight to be given evidence and not to its admissibility.

*State v. Zuniga*, 320 N.C. 233, 255, 357 S.E.2d 898, 912-13 (1987) (citations omitted), *cert. allowed*, 330 N.C. 617, 412 S.E.2d 95 (1992).

The doctor who gathered Lisa's rape kit testified as to the condition of the property and as to Lisa's name, the date, and his signature on the kit, including his name, initials, and date on the final police seal. Thereafter, the patrol officer who took the kit from the doctor and the sheet, the criminalist who later received the evidence and tested it for bodily fluids, and the DNA technical leader who tested the evidence for DNA, all testified as to the condition and the chain of custody of the evidence; their testimonies were consistent with the property sheet. Although the sheet packaging may have become "tattered" over the years, defendant's arguments relate mostly to the credibility of the testimony of those who handled the evidence. Defendant has not directed us to any evidence

contradicting either the identification or authenticity of Lisa's sheet or rape kit. All of the testimony offered regarding the rape kit and sheet establish that the rape kit and sheet were "the same object[s] involved in the incident" and "the object[s] ha[ve] undergone no material change." *Id.* at 255, 357 S.E.2d at 912. Any change in the evidence would have been only degradation of the sperm sample, which resulted in development of only a partial DNA profile including eight of the "polymorphic markers" instead of a full profile containing 15 markers. Yet this partial DNA profile from Lyla's sheet was still sufficient to show a match probability with defendant of one in 730 billion Caucasians and the rape kit profile had a match probability with defendant of one in 36.2 billion Caucasians. We find no error in the trial court's admission of Lyla's sheet and rape kit, and this argument is overruled.

## III. Cheryl's Rape Kit

Defendant next makes essentially the same type of argument regarding Cheryl's rape kit as he did regarding Lyla's rape kit. Cheryl's rape kit included a tube for vaginal swabs, a broken tube of "[d]ark, old blood[,]" and paper with a saliva sample. But here, rather than the chain of custody, defendant focuses on the fact that the victim's blood may have comingled with the

swabs in the rape kit from which the DNA was tested. There was evidence that the tube of blood had broken and possibly stained some other items in the package. Ms. Eva Rossi, the criminalist who performed the DNA extraction and generated the DNA profile, testified "there was no apparent blood on [the vaginal] swabs. There does not appear to be any on the collection tube. So I do not believe that the blood could have potentially contaminated those swabs." Again, defendant's arguments related more to credibility, and he raises only speculation that the samples from Cheryl's kit were contaminated. As to the swabs in the rape kit, again, the testimony established that "the item offered . . . [was] identified as being the same object involved in the incident and . . . ha[d] undergone no material change." *Id.* We find no error in the admission of the evidence, and this argument is overruled.

## IV. State's Closing Argument

Lastly, defendant contends that that the trial court erred in failing to *ex mero motu* strike portions of the State's closing argument regarding "the ingenuity of [defendant's] counsel" in creating reasonable doubt in the juror's minds and the "inherent[] reliabl[ity]" of DNA. Defendant first contends that the prosecutor's argument about defense counsel's ingenuity

violated the Supreme Court's admonition "that 'a trial attorney may not make uncomplimentary comments about opposing counsel, and should "refrain from abusive, vituperative, and opprobrious language, or from indulging in invectives."' *State v. Sanderson*, 336 N.C. 1, 10, 442 S.E.2d 33, 39 (1994)[.]" Specifically, defendant contends the State improperly argued as follows:

> *Now, I also read to juries from an old case called State versus Hammonds, a definition from our State Supreme Court about what reasonable doubt is not. If you're talking about reasonable doubt, it's important for you to know what it isn't as well.* [2] The Court said that [reasonable doubt] is not a doubt suggested by the ingenuity of counsel or by your own ingenuity -- and that means things that the lawyers think up or things that you think up not legitimately warranted by the evidence and the testimony . . .
>
> So as I speak, as [defendant's attorney] speaks, you hold us accountable to that, that we're supposed to be talking about the evidence and not just whimsical ideas to get you distracted from what your duty ought to be. . . .
>
> So [defendant's counsel]'s going to want you -- and I go back to the ingenuity of counsel. He's going to want you to look at those empty locus points and plug information to make you believe or make you

---

[2] Defendant did not note the italicized portions as part of the argument subject to objection in his brief, but we have included these portions simply to place the argument in context.

think that there could be another person involved in this that could be identified, and we haven't -- we haven't done it. And it's not his client. That's as to the profile part. . . .

Another one of the potential ingenuities of counsel is what happened this morning. Ms. Rossi, by implication, is no longer a scientist; she's a hired gun because she works for a crime lab that's associated with law enforcement, like that influences her science ability, like that does anything to make this case different. And I submit to you that that's ingenuity of counsel. That's not something you should even be thinking about. You should be taking the witness that testified before you as experts and deciding if they did their job correctly and not whether they are some sort of hired gun.

We review this issue to determine if the State's argument was so "grossly improper" as to require the trial court to intervene despite the defendant's failure to object. *State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002).

> The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*. In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks

> from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*Id.* (citation omitted).

When making reference to "the ingenuity of [defendant's] counsel[,]" the State was paraphrasing and quoting *State v. Hammonds*, 241 N.C. 226, 85 S.E.2d 133 (1954) which had quoted the "ingenuity" language from *State v. Steele*, 190 N.C. 506, 130 S.E. 308 (1925).[3] *Hammonds*, 241 N.C. at 232, 85 S.E.2d at 138. In *Steele*, the language in question was suggested by the Supreme Court in instructing the jury on the definition of reasonable doubt. *Steele*, 190 N.C. at 512, 130 S.E. at 312. We do not see how this reference is in the least "abusive, vituperative, and opprobrious[,]" *State v. Sanderson*, 336 N.C. 1, 10, 442 S.E.2d 33, 39 (1994) (citation and quotation marks omitted), toward

---

[3] "*Varser, J.*, in speaking for this Court in *S. v. Steele*, *supra*, said: 'We suggest, in addition to the definitions heretofore approved, for its practical terms, the following: "A reasonable doubt, as that term is employed in the administration of criminal law, is an honest, substantial misgiving, generated by the insufficiency of the proof; an insufficiency which fails to convince your judgment and conscience, and satisfy your reason as to the guilt of the accused." It is not "a doubt suggested by the ingenuity of counsel, or by your own ingenuity, not legitimately warranted by the testimony, or one born of a merciful inclination or disposition to permit the defendant to escape the penalty of the law, or one prompted by sympathy for him or those connected with him." *Jackson, J.*, in *U.S. v. Harper*, 33 Fed., 471.'" *Hammonds*, 241 N.C. at 232, 85 S.E.2d at 138.

defense counsel and do not find this phrase to be improper at all, much less "grossly improper[.]" *Jones*, 355 N.C. at 133, 558 S.E.2d at 107. We also note that to the extent that this was an argument about the law, defendant does not argue that the prosecutor misstated the law regarding reasonable doubt. In addition, the trial court instructed the jury on the State's burden of proof beyond a reasonable doubt without objection from the defendant, and defendant does not challenge the instructions to the jury on appeal. This argument is without merit.

The other statement in the argument which defendant argues merited the trial court's *ex mero motu* intervention was the reference to the prosecutor's personal opinion of the "inherent[] reliab[ility]" of DNA evidence. Defendant notes the various portions of the prosecutor's arguments about the DNA evidence he contends were improper:

> You have to believe the DNA science that was presented to you. It's just that simple. If you don't believe in the science, then you're going to be voting not guilty. But we're going to ask you to look real closely at why you don't believe the science. But it is about the numbers. You're talking about a new science that has been accepted in the scientific community and the court community. If it wasn't accepted science, we wouldn't even be talking to each other right now. You wouldn't have ever heard about it. It's accepted science. It has validity. It has trustworthiness. It's reliable. . . .

> But you've got a scientifically-accepted product. You've got qualified technicians that continuously get trained. . . .
>
> I'm submitting to you that I think the DNA evidence in inherently reliable. . . .
>
> Now, going on the reliability of this statistical information, I'm submitting to you that it is reliable.... And the reliability that I'm talking about is showing the connectedness of each of these samples to the locus points involved.

Although it is true that counsel should not argue personal opinion or belief, N.C. Gen. Stat. § 15A-1230 (2013) ("During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence[.]"), taken in context of the entire argument, these statements are not "so grossly improper" as to require the trial court's intervention. *Jones*, 355 N.C. at 133, 558 S.E.2d at 107. The portions of argument quoted above regarding the reliability of DNA evidence were scattered through the prosecutor's summary of the various pieces of the evidence related to the DNA samples tested from the two women; he came to the overall conclusion that the scientific evidence and statistical probabilities pointed only to defendant:

> They weren't tested at the same time.

> They were in the lab at different times. You had different analysts looking at some of it. But the result is the same. The result is Roger Honeycutt.
>
> I'm submitting to you that I think the DNA evidence is inherently reliable.

Although it would have been preferable to omit the words "I think" from the foregoing sentence, this minor change would not substantively change the State's overall argument, which was a proper argument. The State simply argued that DNA is a scientifically recognized form of evidence identifying an individual and pointed out the statistical improbability that the two DNA tests identifying defendant were in error. This argument is overruled.

## V.    Conclusion

For the foregoing reasons, we find no error.

NO ERROR.

Judges HUNTER, JR., Robert N. and DILLON concur.

Report per Rule 30(e).