STATE OF NORTH CAROLINA v. KENNETH NEAL

No. 145A96

(Filed 24 July 1997)

1. **Constitutional Law § 342 (NCI4th)— capital murder— bench conferences—potential jurors excused or deferred—no error**

There was no error in a capital first-degree murder prosecution where potential jurors were excused or deferred during bench conferences, all but one of which were recorded. The conferences were held in the presence of counsel for defendant and the State and defendant was present in the courtroom. It does not appear that defendant's presence would have had a relation, reasonably substantial, to the fulness of his opportunity to defend, such that his absence thwarted the fairness and justness of his trial. The facts in *State v. Buchanan*, 330 N.C. 202 substantially overlap with the facts in this case.

**Am Jur 2d, Criminal Law §§ 692 et seq., 901 et seq.**

**Right of accused to be present at suppression hearing or at other hearing or conference between court and attorneys concerning evidentiary questions. 23 ALR4th 955.**

2. **Jury § 141 (NCI4th)— capital murder—jury selection— parole—defendant not allowed to question prospective jurors**

There was no error in a capital first-degree murder prosecution in the denial of defendant's request to ask prospective jurors

about their understanding of a sentence of life without parole. The North Carolina Supreme Court has consistently decided this issue against defendant's position and the United States Supreme Court has never held that a defendant has a constitutional right to pose this question to prospective jurors. *Simmons v. South Carolina*, 512 U.S. 154, held that the trial court must inform the jury that the sentence of life imprisonment carries with it no possibility of parole where the State argues for the death penalty on the premise that the defendant will be dangerous in the future; that issue was not the basis of the State's argument for the death penalty in this case. Finally, the trial court complied precisely with the provisions of N.C.G.S. § 15A-2002, which provides that the judge shall instruct the jury that a sentence of life imprisonment means life without parole, and there is nothing in the record demonstrating that the jurors did not believe the trial court or follow its instructions. Furthermore, defendant's attorneys repeatedly told the jury that a sentence of life without parole would confine the defendant to a prison cell for the remainder of his life.

**Am Jur 2d, Jury §§ 199, 200, 205, 206.**

**3. Jury § 119 (NCI4th)— capital murder—jury selection— question prohibited—peremptory challenges not exhausted—no error**

The trial court did not abuse its discretion in a capital first-degree murder prosecution where defendant was prevented from asking potential jurors whether they would automatically reject the testimony of mental health professionals, but defendant has not shown prejudice because he indicated that he was "satisfied" with these jurors and did not exhaust his peremptory challenges.

**Am Jur 2d, Jury §§ 205, 208.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**4. Jury § 82 (NCI4th)— capital murder—prospective juror excused for medical reasons—no abuse of discretion**

There was no abuse of discretion in a capital murder prosecution where the trial court excused a prospective juror who had a medical history including coronary bypass surgery and an addiction to Valium and who stated that thinking about the case

was "bringing the problem back," and that the stress of being a prospective juror awakened him in the middle of the night.

**Am Jur 2d, Jury §§ 264, 331.**

5. **Appeal and Error § 147 (NCI4th)— capital murder—nonstatutory mitigating circumstances—peremptory instructions—no objection**

The failure of a defendant in a capital murder prosecution to object to the trial court's peremptory instructions on nonstatutory mitigating circumstances violated Appellate Rule 10(b)(6). Although defendant contended that his request for a peremptory instruction at the charge conference was sufficient compliance to preserve the issue for appellate review, in other cases where Rule 10(b)(2) was liberally construed the trial court agreed to give a specific, requested instruction and then proceeded either to give an instruction which differed from the one specified or to omit the instruction altogether, while here defendant made a general request for peremptory instructions on all of the submitted nonstatutory mitigating circumstances without giving the specific, suggested language and never notified the court of the specific instruction sought. In failing to object, defendant did not allow the court an opportunity to cure any perceived errors; hence, the spirit and purpose of the rule are not met.

**Am Jur 2d, Appellate Review §§ 614-617.**

6. **Criminal Law § 690 (NCI4th Rev.)— capital sentencing— nonstatutory mitigating circumstances—peremptory instructions—no plain error**

The trial court's peremptory instructions on nonstatutory mitigating circumstances in a capital sentencing hearing were reviewed only for plain error where defendant had failed to object at trial and the instructions did not amount to plain error. The jurors could not have failed to understand the meaning of the words "as all of the evidence tends to show in this case" as used in direct reference to and immediately following the words, "This mitigating circumstance is uncontroverted and is manifestly credible." Apparently, defendant's two trial attorneys did not believe the instructions were erroneous or that they enhanced defendant's burden of proof on the ten separate occasions they heard the instructions read to the jury; furthermore, the district attorney's arguments emphasized that the jury should consider

whether these circumstances had mitigating value, not whether the evidence supported the existence of these circumstances.

**Am Jur 2d, Trial §§ 412-416, 1291.**

7. **Criminal Law § 692 (NCI4th Rev.)— capital sentencing— mitigating circumstances—mental or emotional disturbance—impaired capacity—peremptory instructions not given—no error**

The trial court did not err in a capital prosecution for first-degree murder by not giving a peremptory instruction on the statutory mitigating circumstances that the offense was committed while defendant was under the influence of a mental or emotional disturbance or that defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. Although some evidence supported the submission of both circumstances, the evidence was conflicting and the trial court did not err by refusing to give peremptory instructions as to these mitigating circumstances.

**Am Jur 2d, Trial §§ 1120-1129, 1291.**

8. **Criminal Law § 1402 (NCI4th Rev.)— death sentence—not disproportionate**

A death sentence was not disproportionate where the record fully supports the aggravating circumstance found by the jury, there is no indication that the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and this case is more similar to cases where the death sentence was found proportionate than to those in which it was found disproportionate or to those in which juries have consistently returned recommendations of life imprisonment. The characteristics which collectively distinguish this case from those in which the death penalty was held disproportionate are that the jury convicted defendant under the theory of premeditation and deliberation; the victim's brutal murder was found to be especially heinous, atrocious, or cruel; the victim was killed in her own home; the victim suffered great physical pain before her death; and the victim was of unequal physical strength to defendant.

**Am Jur 2d, Criminal Law §§ 609-612.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that mur-**

STATE v. NEAL

[346 N.C. 608 (1997)]

der was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.

Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Cornelius, J., at the 12 February 1996 Criminal Session of Superior Court, Rockingham County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 13 May 1997.

*Michael F. Easley, Attorney General, by William P. Hart, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 1 May 1995 for the first-degree murder of Amanda Lynn McCurdy. The defendant was tried capitally, and the jury found defendant guilty of the first-degree murder on the basis of malice, premeditation and deliberation. Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to death. For the reasons set forth herein, we conclude that the defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

At trial, the State presented evidence tending to show that prior to April 1995, Amanda McCurdy and the defendant had a relationship for seven or eight years, living together for part of that time. McCurdy had two daughters, one of them by the defendant. The defendant had one previous criminal conviction for possession of stolen property, as well as a history of using drugs, particularly crack cocaine.

In the weeks before 13 April 1995, Amanda McCurdy revealed to co-workers, friends and family that the defendant was threatening to kill her. Gardenia Mitchell, a co-worker, testified that McCurdy disclosed to her that McCurdy was attempting to end her relationship with defendant and had put him out of the house. Members of

McCurdy's family, including her father, her sister and her brother, testified that McCurdy told each of them that the defendant was threatening to kill her. McCurdy's twelve-year-old daughter testified that defendant threatened to kill her mother the week before the murder.

Around midday on 13 April 1995, McCurdy dropped her two children off at her father's house so she could rest before going to work. According to the statement given by the defendant to the police, when McCurdy returned home, defendant was waiting outside. The two argued about when the defendant would remove his clothes from the home. Defendant left and walked around the neighborhood for twenty to thirty minutes before returning to the house. The defendant then forced his way into McCurdy's home and continued to argue with her. According to defendant, McCurdy came at him with a hammer, hitting his finger. Defendant took the hammer from McCurdy, and she ran to the bathroom. Before McCurdy could completely shut the door, defendant forced his way into the bathroom, and the two began to "fist fight." McCurdy ran to the living room. According to defendant's statement, McCurdy asked him to "please stop," saying that she would take defendant back. Defendant told her that it was "too late." Defendant hit McCurdy in the head with the hammer multiple times and continued to strike her after she fell to the floor. When the hammer head broke off, defendant jammed the hammer handle down McCurdy's throat.

Defendant then changed his bloody clothes and took the bloody items out of the house in a paper bag. When defendant left the house, McCurdy was still breathing. After leaving McCurdy's house, defendant went to the house of his friend Ronald Mitchell and asked for a plastic bag. Defendant appeared nervous. Defendant then placed the paper bag containing the bloody items into the plastic bag and left the plastic bag in a trash pile located at the road. That afternoon, defendant accepted a ride from Willie Ed Albrighton because defendant "wanted to get off the street." They went to Greensboro, where defendant bought cocaine. From there, defendant went to a motel where he registered under the name "John Smith" and smoked cocaine with three other people.

The next morning, Raymond Logan and Charles McCurdy, the victim's father, summoned police to McCurdy's home after becoming concerned about her well-being. The police discovered McCurdy's body in the living room. A large amount of blood was pooled around her head and spattered around the room. There was a partial shoe impression in blood by McCurdy's feet, which was later matched to a

pair of defendant's tennis shoes. The blood-spatter patterns in the living room indicated that some of the blows to McCurdy's head were delivered near the floor. The head of a hammer lay next to her head, and the hammer handle protruded from her mouth.

Dr. Robert L. Thompson, a pathologist, performed an autopsy on the victim's body. Based on his examination, Dr. Thompson concluded that the cause of death was blunt-force injuries to the victim's head. The injuries sustained were consistent with those that would result from being struck by a hammer. The victim was struck at least fifteen times. Additionally, Dr. Thompson discovered hemorrhages around the victim's neck area, as well as pinpoint hemorrhages in the victim's eyes. Dr. Thompson determined that these injuries resulted from strangulation which occurred prior to death.

On 14 April 1995, defendant was arrested and charged with the first-degree murder of Amanda Lynn McCurdy. After police read defendant his *Miranda* rights, he signed a waiver of those rights. The defendant initially denied any involvement in the death of Amanda McCurdy. However, the defendant later gave oral and written statements describing how he forced his way into the victim's house, argued with the victim and then hit her repeatedly in the head with a hammer. He related how, after the hammer head broke off, he shoved the hammer handle down her throat and then left the house while she was still alive. The defendant also stated that he last used cocaine on Wednesday, 12 April 1995, the day before the murder. After the defendant confessed to killing McCurdy, he led officers to the location of his bag of clothes. Blood on the clothes matched Amanda McCurdy's blood.

A probation officer testified for the defense and stated that defendant tested positive for cocaine use ten times from September 1992 through May 1994. Although the probation officer tried to get defendant to enter treatment programs, defendant refused. A family member and a friend both testified that defendant had a drug problem.

Jeannette Thomason, a psychologist, performed a psychological evaluation of the defendant. Thomason, testifying on behalf of the defendant, stated that he had a long history of drug abuse and was suffering from withdrawal symptoms: depression, confusion and poor judgment. According to Thomason, although the defendant had a limited capacity to deal with stressful situations, he was able to control his impulsiveness.

Dr. David Freeman, a neuroscientist and a physiologist, also testifying on behalf of the defendant, stated that long-term drug usage affects the way the brain operates, and that a withdrawal from the use of cocaine causes depression. However, Dr. Freeman admitted that he had neither talked with nor examined the defendant and that his testimony did not refer specifically to the defendant.

The defendant brings forward thirteen assignments of error for our review, all relating to either the jury selection or the sentencing proceeding.

## JURY SELECTION

[1] In his first assignment of error, the defendant contends that his right to be present during all stages of his trial, pursuant to Article I, Section 23 of the North Carolina Constitution, was violated when the trial court excused jurors during bench conferences. During jury selection, the trial court conducted bench conferences on two separate days where it excused or deferred a total of twelve prospective jurors for mental, physical or hardship reasons. These bench conferences were held in the presence of counsel for defendant and for the State. The substance of each conference was entered into the record, showing the basis for each prospective juror's excusal, with the exception of only one instance. During the conference with the first prospective juror, the court reporter simply noted that the prospective juror handed the trial court a paper which was then handed to the attorneys. The defendant was present in the courtroom throughout these proceedings.

Article I, Section 23 of the North Carolina Constitution requires that defendants must be present at every stage of a capital trial proceeding. *State v. Buchanan*, 330 N.C. 202, 217, 410 S.E.2d 832, 841 (1991); *State v. Huff*, 325 N.C. 1, 29, 381 S.E.2d 635, 651 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990); *State v. Payne*, 320 N.C. 138, 139, 357 S.E.2d 612, 612 (1987). This requirement arises out of the Confrontation Clause of the North Carolina Constitution, which provides in pertinent part: "In all criminal prosecutions, every person charged with crime has the right . . . to confront the accusers and witnesses with other testimony . . . ." N.C. Const. art. I, § 23.

The constitutional requirement of the defendant's presence at a capital trial protects the defendant's interests, as well as the public interest in preserving human life. This requirement also "protects the integrity of the system by preserving the appearance of fairness and

by optimizing the conditions for finding the truth." *Huff*, 325 N.C. at 30, 381 S.E.2d at 651. Hence, a defendant in a capital trial may not waive this right. *Id.*; *Payne*, 320 N.C. at 139, 357 S.E.2d at 612; *State v. Moore*, 275 N.C. 198, 208, 166 S.E.2d 652, 659 (1969). Moreover, the trial court bears a duty to insure that the defendant is present throughout his trial. *Huff*, 325 N.C. at 31, 381 S.E.2d at 651; *Payne*, 320 N.C. at 139, 357 S.E.2d at 612.

Nevertheless, "[t]he burden is on the defendant to show the usefulness of his presence in order to prove a violation of his right to presence." *State v. Buchanan*, 330 N.C. at 224, 410 S.E.2d at 845. Once the defendant meets this burden, the burden shifts to the State to establish that the error is harmless beyond a reasonable doubt. *Id.*; *Huff*, 325 N.C. at 35, 381 S.E.2d at 654.

In *State v. Buchanan*, several bench conferences preceded the excusal of prospective jurors for cause with the express consent of counsel for the defendant and counsel for the State. The facts in *Buchanan* substantially overlap with the facts in the case *sub judice*; however, unlike *Buchanan*, here all of the bench conferences except one *were* recorded. In both cases,

> defendant was personally present in the courtroom during the conferences. Further, and perhaps more importantly, his actual presence was not negated by the trial court's actions. At each of the conferences defendant was represented by his attorneys. Defendant was able to observe the context of each conference and inquire of his attorneys at any time regarding its substance. Through his attorneys defendant had constructive knowledge of all that transpired. Following the conferences defense counsel had the opportunity and the responsibility to raise for the record any matters to which defendant took exception. At all times defendant had a first-hand source of information as to the matters discussed during a conference.

*Buchanan*, 330 N.C. at 223, 410 S.E.2d at 844-45.

In *Buchanan*, we held that "a defendant's state constitutional right to be present at all stages of his capital trial is not violated when, with defendant present in the courtroom, the trial court conducts bench conferences, even though unrecorded, with counsel for both parties." *Id.* at 223, 410 S.E.2d at 845.

In the instant case, as in *Buchanan*, it does not appear that "defendant's presence would have had 'a relation, reasonably sub-

stantial, to the fulness of his opportunity to defend,' such that his absence thwarted the fairness and justness of his trial." *Buchanan*, 330 N.C. at 215, 410 S.E.2d at 839 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 78 L. Ed. 674, 678 (1934)). Accordingly, we hold that defendant's constitutional right to be present at all stages of his capital trial was not violated in this case. This assignment of error is overruled.

[2] In his next assignment of error, defendant argues that the trial court erred by denying his request to conduct *voir dire* of prospective jurors as to their understanding of the meaning of a sentence of life without parole, so as to allow proper exercise of cause and peremptory challenges and determine whether venire members had misconceptions about parole eligibility that might bias them in favor of capital punishment. This Court has consistently decided this issue against defendant's position. *See, e.g., State v. Chandler*, 342 N.C. 742, 749, 467 S.E.2d 636, 648, *cert. denied,* —— U.S. ——, 136 L. Ed. 2d 133 (1996); *State v. Skipper*, 337 N.C. 1, 24, 446 S.E.2d 252, 264 (1994), *cert. denied,* 513 U.S. 1134, 130 L. Ed. 2d 895 (1995); *State v. Green*, 336 N.C. 142, 157, 443 S.E.2d 14, 23, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994); *State v. Lee*, 335 N.C. 244, 268, 439 S.E.2d 547, 558, *cert. denied,* 513 U.S. 891, 130 L. Ed. 2d 162 (1994); *State v. Syriani*, 333 N.C. 350, 399, 428 S.E.2d 118, 145, *cert. denied,* 510 U.S. 948, 126 L. Ed. 2d 341 (1993).

Furthermore, the United States Supreme Court has never held that a defendant has a constitutional right to pose this question to prospective jurors. To support his argument, defendant cites *Simmons v. South Carolina*, 512 U.S. 154, 129 L. Ed. 2d 133 (1994). As we have stated previously, the *Simmons* Court "did not hold that a defendant has a constitutional right to question the venire about parole." *State v. Spruill*, 338 N.C. 612, 638, 452 S.E.2d 279, 292 (1994), *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 63 (1995). *Simmons* simply held that where the State argues for the death penalty on the premise that the defendant will be dangerous in the future, the trial court must inform the jury that the sentence of life imprisonment carries with it no possibility of parole. The issue of defendant's danger to society in the future was not the basis of the State's argument for the death penalty in this case.

Finally, the trial court in the case *sub judice* complied precisely with the provisions of N.C.G.S. § 15A-2002, which provides in part: "The judge shall instruct the jury, in words substantially equivalent to

those of this section, that a sentence of life imprisonment means a sentence of life without parole." N.C.G.S. § 15A-2002 (Supp. 1996). There is nothing in the record demonstrating that the jurors did not believe the trial court or did not follow its instructions. "We presume 'that jurors . . . attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.' " *State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208 (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985)), *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). Furthermore, the defendant's trial attorneys repeatedly told the jury that a sentence of life without parole would confine the defendant to a prison cell for the remainder of his life. Therefore, we hold that the trial court did not err in denying defendant's motion to explore the issue of parole during *voir dire*. This assignment of error is overruled.

[3] In his next assignment of error, the defendant contends that the trial court erred by preventing his defense counsel from asking prospective jurors whether they would automatically reject the testimony of mental health professionals. The defendant contends that this question did not attempt to impermissibly stake out the jurors but rather sought to uncover jurors who would refuse to listen to a psychologist's testimony. We find this argument to be without merit.

"The trial court is given broad discretion to control the extent and manner of questioning prospective jurors, and its decisions will not be overturned absent an abuse of discretion." *State v. Mash*, 328 N.C. 61, 63, 399 S.E.2d 307, 309 (1991). In *Mash*, this Court found no abuse of discretion when the defendant was prevented from "inquiring into the potential jurors' attitudes about . . . the expert testimony of psychiatrists and psychologists." *Id*. Similarly, we find that the trial court did not abuse its discretion in the case *sub judice*.

Even assuming, *arguendo*, that the defendant has demonstrated an abuse of discretion, the defendant has not shown that he was prejudiced thereby. The defendant argues that he was unable to question eight of the twelve jurors regarding their views towards psychological testimony. However, the record shows the defendant expressed that he was "satisfied" with these jurors at a point when he had used only two peremptory challenges. Because the defendant had not exhausted his peremptory challenges, he cannot demonstrate prejudice. *See Mash*, 328 N.C. at 64, 399 S.E.2d at 310. This assignment of error is overruled.

**[4]** The defendant asserts in his next assignment of error that the trial court improperly excused a prospective juror for medical reasons without allowing the defendant to question the juror. The prospective juror was desirable to the defendant because the juror had experienced drug dependency and was reluctant to impose the death penalty. Nonetheless, we hold this assignment of error lacks merit.

"A defendant is not entitled to any particular juror. His right to challenge is not a right to select but to reject a juror." *State v. Harris*, 338 N.C. 211, 227, 449 S.E.2d 462, 470 (1994). According to N.C.G.S. § 15A-1212(2), a party may challenge for cause a prospective juror who is incapable of performing jury service by reason of mental or physical infirmity. Additionally, N.C.G.S. § 9-6(a) provides that citizens qualified for jury service may be excused for reasons "of compelling personal hardship." N.C.G.S. § 9-6(a) (1986).

Decisions concerning the excusal of prospective jurors are matters of discretion left to the trial court.

"[I]t is the duty of the trial judge to see that a competent, fair and impartial jury is empaneled, and to that end the judge may, in his discretion, excuse a prospective juror even without challenge from either party. Decisions as to a juror's competency at the time of selection and his continued competency to serve are matters resting in the trial judge's sound discretion and are not subject to review unless accompanied by some imputed error of law."

*State v. McKenna*, 289 N.C. 668, 680, 224 S.E.2d 537, 546 (quoting *State v. Waddell*, 289 N.C. 19, 29, 220 S.E.2d 293, 300 (1975), *death sentence vacated*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976)), *death sentence vacated*, 429 U.S. 912, 50 L. Ed. 2d 278 (1976).

In the instant case, the prospective juror had a medical history including coronary bypass surgery and an addiction to Valium. He stated that thinking about the case was "bringing the problem back," and that the stress of being a prospective juror awakened him in the middle of the night. The trial court properly exercised its discretion in excusing a prospective juror whose health was possibly in jeopardy. Accordingly, this assignment of error is overruled.

## CAPITAL SENTENCING PROCEEDING

**[5]** In his next assignment of error, defendant contends that the trial court erred in its peremptory instructions on nonstatutory mitigating

circumstances. The trial court agreed to submit ten nonstatutory mitigating circumstances and to give peremptory instructions on all. The trial court gave the following instruction as to each:

> If one or more of you finds from the evidence before you that this mitigating circumstance is uncontroverted and is manifestly credible as all the evidence tends to show in this case then the defendant is entitled for you to find this mitigating circumstance.

> And if one or more of you finds by the preponderance of the evidence that this circumstance is also deemed mitigating, you would so indicate by having your foreman write "yes" in the space provided after this mitigating circumstance on the "Issues and Recommendation" form.

No juror answered in the affirmative as to any of the ten nonstatutory mitigators submitted.

The defendant asserts that these instructions failed to convey to the jurors that the evidence was uncontradicted and improperly imposed a higher burden of proof on the defense. We have stated previously that before a jury finds a nonstatutory mitigating circumstance, it must determine: first, that the evidence supports the existence of the circumstance and, second, that the circumstance has mitigating value. *State v. Fullwood*, 323 N.C. 371, 396, 373 S.E.2d 518, 533 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990). According to the defendant's argument, before the jury could make these two determinations, the trial court's instructions erroneously forced jurors to determine (1) whether the evidence was uncontroverted, and (2) whether the evidence was manifestly credible.

However, the defendant failed to object to this instruction, after any of the ten separate times that it was given or at the conclusion of the instructions, before the jury began deliberations. Thus, Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure bars this assignment of error. According to the Rule, "A party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly that to which he objects and the grounds of his objection . . . ." N.C. R. App. P. 10(b)(2). "The purpose of Rule 10(b)(2) is to encourage the parties to inform the trial court of errors in its instructions so that it can correct the instructions and cure any potential errors before the jury deliberates on the case and thereby

eliminate the need for a new trial." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983).

Notwithstanding his failure to object to the instruction given, the defendant claims that his request for a peremptory instruction at the charge conference is sufficient compliance with Rule 10(b)(2) to preserve this issue for appellate review. The defendant likens his case to other cases where this Court liberally construed the meaning of Rule 10(b)(2). *See, e.g., State v. Keel*, 333 N.C. 52, 423 S.E.2d 458 (1992); *State v. Ross*, 322 N.C. 261, 367 S.E.2d 889 (1988). These cases differ from the case *sub judice* significantly. In these cases, the trial court agreed to give a *specific*, requested instruction, and then proceeded either to give an instruction which differed from the one specified or to omit the instruction altogether. Here, in contrast, the defendant made a *general* request for peremptory instructions on all of the submitted nonstatutory mitigating circumstances without giving the specific, suggested language. Defense counsel never notified the trial court of the specific instruction sought. Furthermore, the defendant, in failing to object to the given instruction, did not allow the trial court an opportunity to cure any perceived errors. Hence, "the spirit and purpose of Rule 10(b)(2) are not met." *State v. Allen*, 339 N.C. 545, 554-55, 453 S.E.2d 150, 155 (1995), *overruled by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396 (1997).

[6] Because this issue has not been preserved for appeal, we may review it only for plain error. *Odom*, 307 N.C. at 660, 300 S.E.2d at 378. "To constitute plain error, an instructional error must be 'so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him.' " *State v. Payne*, 337 N.C. 505, 523, 448 S.E.2d 93, 103 (1994) (quoting *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993)), *cert. denied*, 514 U.S. 1038, 131 L. Ed. 2d 292 (1995). Defendant, therefore, "must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993). Indeed, "[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection had been made in the trial court." *State v. White*, 343 N.C. 378, 391, 471 S.E.2d 593, 600 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977)), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 229 (1996).

After careful consideration of this instruction in light of the arguments presented and the relevant record, we conclude that the trial

court's instructions did not amount to plain error. We do not perceive how the jurors could have failed to understand the meaning of the words "as all the evidence tends to show in this case," which words were used and applied in direct reference to and immediately following the words: "This mitigating circumstance is uncontroverted and is manifestly credible." Apparently, the defendant's two trial attorneys did not believe the trial court's instructions here were erroneous or that the instructions enhanced defendant's burden of proof on the ten separate occasions they heard the instructions read to the jury. Furthermore, the district attorney's arguments emphasized that the jury should consider whether these circumstances had mitigating value, not whether the evidence supported the *existence* of these circumstances. Hence, even though the trial court's instruction arguably may not have been "a model of clarity," we do not believe that it affected the outcome of the case. *State v. Williams*, 339 N.C. 1, 46, 452 S.E.2d 245, 272 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 61 (1995). This assignment of error is overruled.

[7] In his next assignment of error, the defendant contends that the trial court erred by failing to give peremptory instructions on the statutory mitigating circumstances that the offense was committed while the defendant was under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2) (Supp. 1996), and that the defendant's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6). We conclude that this assignment of error lacks merit. The trial court agreed to submit three statutory mitigating circumstances, in addition to the (f)(9) catchall, and to peremptorily charge the jury as to the (f)(1) mitigator, that the defendant has no significant history of prior criminal activity. Although given a peremptory charge on this circumstance, none of the jurors found it to exist. In this regard, this Court has stated:

"Where . . . all of the evidence in [a capital prosecution], if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance." *State v. Johnson*, 298 N.C. 47, 76, 257 S.E.2d 597, 618 (1979). Even if the jury is given a peremptory instruction in regard to a certain mitigating circumstance, the individual jurors may still reject that circumstance on the basis that the supporting evidence was not convincing. *Huff*, 325 N.C. at 59, 381 S.E.2d at 669.

.

*State v. Gay*, 334 N.C. 467, 492, 434 S.E.2d 840, 854 (1993) (alteration in original).

In the case *sub judice*, the trial court did not err in failing to give peremptory instructions on either the (f)(2) or (f)(6) statutory mitigating circumstances because the evidence was not uncontroverted. Although some evidence supported the *submission* of both of these statutory mitigating circumstances, there was also evidence negating the (f)(2) statutory mitigating circumstance, that the defendant was under the influence of a mental or emotional disturbance, as well as the (f)(6) statutory mitigating circumstance, that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

Jeannette Thomason, the psychologist who evaluated the defendant, testified that defendant had a history of drug abuse and dependency, and that he was suffering from withdrawal symptoms. Thomason further testified that in her opinion, the defendant lacked the ability to control his behavior at the time of the crime. However, she also testified that defendant *was* able to control his impulsiveness.

According to the testimony of Dr. David Freeman, long-term drug usage affects the way the brain operates. However, Dr. Freeman also stated that he had not talked with the defendant personally and that his testimony did not refer specifically to the defendant.

While several witnesses testified regarding the defendant's drug abuse, other witnesses provided contradictory testimony. The defendant's employer testified that he had never seen any signs of drug use by the defendant. The defendant's sister-in-law testified that she was unaware of any problems the defendant may have had. Finally, the defendant's brother testified that, while he knew the defendant had a drug problem, he had seen no changes in the defendant over the years.

The testimony of witnesses who saw defendant immediately after the murder does not support the position that defendant was under the influence of a mental or emotional disturbance when he killed the victim, or that he failed to appreciate the criminality of his actions. Ronald Mitchell and Willie Ed Albrighton both testified that the defendant was not discernibly impaired. When the defendant was arrested the day after the murder, officers noted that he did not appear impaired or intoxicated. Further, the defendant stated that he did not use drugs until after the murder.

Additionally, the defendant's statement to police officers about his conduct leading up to and during the murder demonstrated purposefulness and deliberation. After arguing with McCurdy, defendant walked around the neighborhood for twenty or thirty minutes before returning. The defendant could recall his conversation and his actions in detail. When McCurdy said she was sorry and that she would take the defendant back, he responded that it was "too late." His response demonstrates deliberate thought. Finally, the defendant's actions after killing McCurdy also demonstrate a recognition of the criminality of his conduct. The evidence shows defendant was sufficiently aware of his actions in that he wanted to "get off the street" and he registered in a motel in another county under a false name after removing and hiding his bloody clothes.

We conclude that the evidence is conflicting as to whether defendant was under the influence of a mental or emotional disturbance when he committed the murder and as to whether defendant's capacity to appreciate the criminality of his conduct was impaired. Therefore, the trial court did not err by refusing to give peremptory instructions as to these mitigating circumstances. " '[A] peremptory instruction is inappropriate when the evidence surrounding that issue is conflicting.' " *State v. Lynch,* 340 N.C. 435, 476-77, 459 S.E.2d 679, 700 (1995) (quoting *State v. Noland,* 312 N.C. 1, 20, 320 S.E.2d 642, 654 (1984), *cert. denied,* 469 U.S. 1230, 84 L. Ed. 2d 369 (1985)), *cert. denied,* —— U.S. ——, 134 L. Ed. 2d 558 (1996).

We note that even though the trial court refused to give a peremptory instruction on the mitigating circumstance of whether defendant was under the influence of a mental or emotional disturbance, the jury nevertheless found this statutory circumstance to exist.

This assignment of error is overruled.

## PRESERVATION ISSUES

The defendant raises seven issues which he concedes have been decided against his position by this Court: (1) the trial court erred by submitting to the jury the especially heinous, atrocious, or cruel aggravating circumstance within the context of instructions that "failed adequately to limit the application of this inherently vague and overly broad circumstance"; (2) the trial court erred by preventing the defendant from asking all jurors whether they would in all cases sentence a convicted murderer to die; (3) the trial court erred by preventing the defendant from addressing the jury in allocution; (4) the

trial court erred by permitting the prosecutor to engage in extensive biblically based argument for death; (5) the trial court erred by using the "inherently ambiguous" terms "satisfaction" and "satisfy" to instruct the jury as to the defendant's burden of proof applicable to mitigating circumstances; (6) the trial court erred by instructing the jurors that they could reject nonstatutory mitigating evidence on the basis that it had no mitigating value; and (7) the trial court's use of the term "may" in sentencing Issues Three and Four made consideration of proven mitigation discretionary with the sentencing jurors. We have fully considered the defendant's arguments relating to these assignments of error and find no compelling reason to depart from our prior holdings. Therefore, we overrule each of these assignments of error.

## PROPORTIONALITY REVIEW

[8] Having concluded that defendant's trial and separate capital sentencing proceeding were free of prejudicial error, we are required by statute to review the record and determine (1) whether the evidence supports the aggravating circumstance found by the jury; (2) whether passion, prejudice or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). After thoroughly reviewing the record, transcript and briefs in the present case, we conclude that the record fully supports the aggravating circumstance found by the jury. Further, we find no indication that the sentence of death in this case was imposed under the influence of passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We defined the pool of cases for proportionality review in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, 513 U.S. 1159, 130

L. Ed. 2d 1083 (1995), and we compare the instant case to others in the pool that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. at 198, 443 S.E.2d at 47.

In the case *sub judice*, the jury found the defendant guilty of first-degree murder on the basis of premeditation and deliberation. At sentencing, the trial court submitted the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). The jury unanimously found the existence of this aggravating circumstance. The jury found one of the three statutory mitigating circumstances submitted for its consideration: that the capital felony was committed while the defendant was mentally or emotionally disturbed, N.C.G.S. § 15A-2000(f)(2). The jury declined to find the existence or mitigating value of any one of the ten nonstatutory mitigating circumstances submitted.

This case has several distinguishing characteristics: The jury convicted the defendant under the theory of premeditation and deliberation; the victim's brutal murder was found to be especially heinous, atrocious, or cruel; the victim was killed in her own home; the victim suffered great physical pain before her death; and finally, the victim was of unequal physical strength to defendant. These characteristics collectively distinguish this case from those in which we have held the death penalty disproportionate.

In our proportionality review, it is appropriate to compare the present case to those cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). Of the cases in which this Court has found the death penalty disproportionate, only two involved the especially heinous, atrocious, or cruel aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983). Neither *Stokes* nor *Bondurant* is similar to this case.

In *Stokes*, the defendant and a group of coconspirators robbed the victim's place of business. No evidence showed who the "ringleader" of the group was. This Court vacated the sentence of death because the defendant was only a teenager, and it did not appear that

defendant Stokes was more deserving of death than an accomplice, who was considerably older and received only a life sentence. *Stokes*, 319 N.C. at 21, 352 S.E.2d at 664. In the present case, the defendant alone was responsible for the victim's death. Defendant Stokes was only seventeen years old at the time of his crime. In this case, the defendant was thirty-eight years old at the time of the crime. In *Stokes*, the defendant was convicted under a theory of felony murder, and there was virtually no evidence of premeditation and deliberation. In the present case, the defendant was convicted upon a theory of premeditation and deliberation. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Finally, in *Stokes*, the victim was killed at his place of business. In this case, the victim was killed in her living room. A murder in one's home "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

In *Bondurant*, the victim was shot while riding with the defendant in a car. *Bondurant* is distinguishable because the defendant immediately exhibited remorse and concern for the victim's life by directing the driver to go to the hospital. The defendant also went into the hospital to secure medical help for the victim. In the present case, by contrast, the defendant hit the victim's head with a hammer multiple times, ensuring the victim's death. Further, the defendant did not seek medical aid for the victim. Instead, the defendant thrust the broken hammer handle down the victim's throat and then left the house while the victim was still breathing, hid his bloody clothes, and spent the evening using cocaine.

For the foregoing reasons, we conclude that each case where this Court has found a sentence of death disproportionate is distinguishable from the case *sub judice*.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out

that duty." *Id.* It suffices to say here that we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Finally, we noted in *State v. Daniels*, 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995), that similarity of cases is not the last word on the subject of proportionality. Similarity "merely serves as an initial point of inquiry." *Id.*; *see also State v. Green*, 336 N.C. at 198, 443 S.E.2d at 46-47. The issue of whether the death penalty is proportionate in a particular case ultimately rests "on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators and other circumstances." *Daniels*, 337 N.C. at 287, 446 S.E.2d at 325.

Based on the nature of this crime, and particularly the distinguishing features noted above, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that the defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.