STATE OF NORTH CAROLINA v. JAMIE LAMONT SMITH

No. 233A96

(Filed 6 February 1998)

## 1. Jury § 141 (NCI4th)— capital trial—jury voir dire—beliefs about parole—questions not permitted

The trial court in a capital sentencing proceeding did not err by refusing to allow defendant to inquire, during jury selection, into the prospective jurors' attitudes and beliefs about parole where defendant was sentenced under the scheme in which the sentencing alternative to the death penalty is life in prison without parole, and the trial court instructed the jurors in accordance with N.C.G.S. § 15A-2002 that "if you recommend a sentence of life imprisonment, the Court will impose a sentence of life imprisonment without parole."

## 2. Evidence and Witnesses §§ 2670, 2671 (NCI4th)— disclosure of medical records—implicit necessity finding—no abuse of discretion

The trial court did not err by ordering the disclosure of defendant's medical records from jail without a specific finding that disclosure was necessary to a proper administration of justice since such finding is implicit in the admission of the records into evidence. Furthermore, the trial court did not abuse its discretion in ordering the medical records disclosed where defendant sought to suppress statements he made to the police while in jail on the ground that he was suffering from controlled substance withdrawal symptoms and was in no condition mentally to give statements to the police, and the State sought to rebut that evidence with his medical records from jail. N.C.G.S. § 8-53.

## 3. Jury § 256 (NCI4th)— peremptory challenge—racial discrimination—insufficient showing

Defendant's showing that he is black and that the State peremptorily struck one black prospective juror was insufficient to establish a *prima facie* case of racial discrimination.

## 4. Jury § 256 (NCI4th)— peremptory challenge—race-neutral reasons—prima facie inquiry not moot

The *prima facie* case inquiry does not become moot when the State provides race-neutral reasons for its peremptory strike.

**5. Homicide § 552 (NCI4th)— first-degree murder case—self-serving statement—insufficient to require instruction on second-degree murder**

In this prosecution for first-degree murder and attempted first-degree murder arising from an apartment building fire set by defendant, defendant's self-serving statement to officers that he set the fire as a prank was not sufficient evidence of his lack of premeditation and deliberation to entitle him to an instruction on second-degree murder and attempted second-degree murder where the evidence, reasonably construed, indicates that defendant burned the apartment building in an attempt to eliminate witnesses who might be able to testify against him regarding his theft of mail from the apartment building; defendant told an officer that he became concerned about the mail theft being traced to him, so he and a companion decided to burn the building; the two men drove by the building late at night to observe the area, bought kerosene, and drove around before returning between two and three in the morning; defendant admitted that he poured kerosene in front of the apartment door of a woman whose credit card number he had stolen and used; and when the kerosene did not light, he splashed it up the stairs and into the stairwell and succeeded in lighting it. Any reasonable construction of the evidence indicates that the murder was both premeditated and deliberate.

**6. Criminal Law § 478 (NCI4th Rev.)— prosecutor's improper question—curative instruction**

After defendant's expert testified on cross-examination that he had not medicated defendant during incarceration because it would have interfered with diagnosis and defendant had not had problems with violence, any improper conduct by the prosecutor in asking the witness whether he "didn't hear that [defendant] beat up Richard Jackson or tried to rape him or anything like that" was sufficiently corrected by the trial court's curative instruction that the jury should not consider the question.

**7. Criminal Law § 478 (NCI4th Rev.)— question by prosecutor—no prosecutorial misconduct**

In a prosecution for murder and attempted murder by setting an apartment building on fire, the trial court did not err by permitting the prosecutor to ask defendant's expert witness whether

**STATE v. SMITH**

[347 N.C. 453 (1998)]

an intelligence test administered to defendant contained the question, "If you buy six dollars worth of gasoline and pay for it with a ten-dollar bill, how much change should you receive?" and, when the witness answered in the affirmative, to ask the witness, "He knew that one, didn't he?" Although defendant contended that the State asked the questions only for the rhetorical purpose of alluding to defendant's purchase of kerosene with which he set the fire, the questions did not resemble the prosecutorial misconduct condemned in *State v. Sanderson*, 336 N.C. 1, 442 S.E.2d 33.

**8. Criminal Law § 450 (NCI4th Rev.)— capital trial—prosecutor's argument—videotape—premeditation and deliberation—no reliance on prosecutor's judgment**

Where, in describing evidence presented to prove premeditation and deliberation during closing argument in a prosecution for first-degree murder arising from an apartment building fire, the prosecutor referred to a convenience store videotape showing defendant purchasing kerosene used in starting the fire, the prosecutor's subsequent statement, "This is one of the better cases, ladies and gentlemen, that any jury in Buncombe County will ever see. You can see premeditation and deliberation" was not an improper argument asking the jury to rely on the prosecutor's judgment as an expert but merely focused on the unique evidence of premeditation and deliberation presented in the case. In any event, the argument was not so grossly improper as to require intervention by the trial court *ex mero motu*.

**9. Criminal Law § 458 (NCI4th Rev.)— capital sentencing—prosecutor's argument—references to another murder victim—course of conduct aggravating circumstance**

In a capital sentencing proceeding wherein evidence concerning defendant's rape, murder and burning of another woman less than one month after the murder in this case was properly admitted to support the (e)(11) course of conduct aggravating circumstance, the prosecutor's references in his final summation to the other murder victim did not amount to improperly asking the jury to sentence defendant to death for a crime for which he was not being tried but was a proper argument that defendant deserved the death penalty based on the evidence supporting the (e)(11) aggravating circumstance. N.C.G.S. § 15A-2000(e)(11).

**10. Criminal Law § 453 (NCI4th Rev.)— capital sentencing— prosecutor's argument—no due process for victims—no gross impropriety**

Any denigration of defendant's constitutional rights that might be implied from the prosecutor's argument in a capital sentencing proceeding about due process rights afforded defendant by the trial and the absence of due process for the victims was not so grossly improper as to require intervention by the trial court.

**11. Criminal Law § 460 (NCI4th Rev.)— capital sentencing— comfortable life in prison—proper argument for death penalty**

The trial court did not abuse its discretion in failing to intervene *ex mero motu* when the State argued in a capital sentencing proceeding that if defendant were sentenced to life in prison, he would spend his time comfortably doing things such as playing basketball, lifting weights, and watching television, since the argument merely emphasized the State's position that defendant deserved the death penalty rather than a comfortable life in prison.

**12. Criminal Law § 1359 (NCI4th Rev.)— capital sentencing— two aggravating circumstances—same evidence—different aspects of defendant's character**

The trial court did not err by submitting in a capital sentencing proceeding both the (e)(5) aggravating circumstance that the murder was committed while defendant was engaged in arson and the (e)(10) aggravating circumstance that defendant knowingly created a great risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more then one person, even though both circumstances were based on the fact that defendant committed the murder by means of arson, since the (e)(5) circumstance addresses a different aspect of defendant's character than does the (e)(10) circumstance in that the (e)(5) circumstance is considered aggravating because it addresses the fact that defendant committed the murder while engaging in another felony, and the (e)(10) circumstance speaks to a distinct aspect of defendant's character that he not only intended to kill a particular person when he set fire to an apartment building but he disregarded the value of every human life in the building by using an accelerant to set the fire in the middle of the night. N.C.G.S. § 15A-2000(e) (5), (e)(10).

**13. Criminal Law § 1382 (NCI4th Rev.)— capital sentencing— mitigating circumstance—no significant criminal history— absence of prejudice in submission**

The trial court did not err to defendant's prejudice by submitting, over defendant's objection, the (f)(1) mitigating circumstance that defendant had no significant history of prior criminal activity where there are no extraordinary facts present that establish harm to defendant from the submission of this mitigating circumstance. N.C.G.S. § 15A-2000(f)(1).

**14. Criminal Law § 1351 (NCI4th Rev.)— capital sentencing— Issues and Recommendation as to Punishment form— catchall circumstance—unanimity not required**

The Issues and Recommendation as to Punishment form submitted to the jury in a capital sentencing proceeding did not unconstitutionally require unanimity from jurors in order to find the (f)(9) statutory catchall mitigating circumstance where both the form and the court's instruction explaining it made clear that the jury should find the circumstance if "one or more" of the jurors found it to exist. N.C.G.S. § 15A-2000(f)(9).

**15. Criminal Law § 1402 (NCI4th Rev.)— death sentence not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in similar cases where the jury found as statutory aggravating circumstances that defendant had previously been convicted of a violent felony, that defendant committed the murder for the purpose of avoiding arrest, that defendant committed this murder while engaged in first-degree arson, that defendant knowingly created a great risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more than one person, and that the murder was part of a course of conduct in which defendant committed crimes of violence against other persons; defendant burned an apartment building in the early morning hours by setting fire to kerosene poured in the building in an attempt to eliminate witnesses who might be able to testify against him regarding his theft of mail from the building; the victim died from smoke inhalation and two other tenants suffered severe burns and other injuries; and defendant admitted to setting additional fires.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Downs, J., at the 22 April 1996 Criminal Session of Superior Court, Buncombe County, upon a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for first-degree arson, conspiracy to commit first-degree arson, two counts of attempted first-degree murder, misdemeanor larceny, and credit card fraud was allowed 17 July 1997. Heard in the Supreme Court 15 December 1997.

*Michael F. Easley, Attorney General, by Valérie B. Spalding, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Marshall Dayan, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

On 1 May 1995 the Buncombe County Grand Jury indicted defendant Jamie Lamont Smith for the attempted first-degree murder of and assault with a deadly weapon with intent to kill inflicting serious injury on Erin Conklin, conspiracy to commit first-degree arson, first-degree murder of David Cotton, attempted first-degree murder of Alison Kafer, first-degree arson, misdemeanor larceny, and misdemeanor financial transaction card fraud. Defendant was tried capitally at the 22 April 1996 Criminal Session of Superior Court, Buncombe County. He presented no evidence during the guilt/innocence phase of the trial. The jury found defendant guilty of all charges.

After a capital sentencing proceeding, the jury found the existence of five aggravating circumstances and seven mitigating circumstances and recommended a sentence of death for the first-degree murder of David Cotton. The trial court imposed the death sentence for this murder and further imposed consecutive sentences of imprisonment for defendant's other convictions. It arrested judgment on the conviction for assault with a deadly weapon with intent to kill inflicting serious injury on Erin Conklin. For the reasons set forth herein, we conclude that defendant received a fair trial, free from prejudicial error, and that the sentence of death is not disproportionate.

The State's evidence tended to show the following. In December 1994 defendant stole mail from Grace Apartments in Asheville, North Carolina, and acquired Pamela Acheson's Sears credit card number

from a Sears credit card bill in the stolen mail. Defendant used the credit card number to purchase clothes valued at $268.98 from a Sears catalog on 19 December 1994.

Early in the morning on 21 December 1994, defendant began to worry that the police could connect him to his mail theft. Defendant and a companion decided to destroy the evidence of the theft by setting fire to Grace Apartments. They purchased kerosene from the Hot Spot convenience store, put it in an antifreeze jug, and went to Grace Apartments sometime around 3:00 a.m. There, defendant poured half of the jug of kerosene along the hallway in front of Pamela Acheson's apartment. Defendant failed in his attempt to light this kerosene. He then splashed more kerosene up the stairs toward the second floor. Defendant laid the kerosene jug on the floor and lit it as he left the apartment complex. As defendant and his companion drove away, they could see fire raging in the building.

The fire spread rapidly and caused significant consequences. David Cotton died in his second floor apartment from smoke inhalation. Erin Conklin suffered severe burns to her hands and arms when the fire reached her as she hung out her window. She also suffered a broken neck when she fell from her window after her burning hands could no longer cling to the window ledge. Alison Kafer suffered severe burns over seventy percent of her body as well as severe inhalation injury to her lungs from breathing smoke.

Defendant confessed to setting the fire and to setting two other fires in apartment complexes. The State presented evidence of the additional fires during defendant's sentencing proceeding.

[1] In defendant's first assignment of error, he argues that the trial court erred in refusing to allow him to inquire, during jury selection, into the prospective jurors' attitudes and beliefs about parole. Defendant asserts that empirical evidence shows that jurors often do not believe that a defendant who is sentenced to life imprisonment will actually spend the rest of his or her life incarcerated. Defendant points to the opinions of this Court in *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995), and *State v. Quesinberry*, 325 N.C. 125, 381 S.E.2d 681 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), to support this assertion. In both *Robinson* and *Quesinberry*, the defendants collaterally attacked their death sentences with juror affidavits that revealed the jurors' conceptions of parole eligibility for defendants sentenced to life imprisonment. At least one juror in

*Robinson* said she believed the defendant would be released in five to ten years if sentenced to life. *Robinson*, 336 N.C. at 124, 443 S.E.2d at 329. Jurors in *Quesinberry* similarly believed that the defendant might be paroled in ten years if given a life sentence. *Quesinberry*, 325 N.C. at 132, 381 S.E.2d at 686.

Here, defendant was sentenced under our current capital sentencing scheme in which the sentencing alternative to the death penalty is life in prison without parole. Under this scheme the trial court is statutorily required to "instruct the jury . . . that a sentence of life imprisonment means a sentence of life without parole." N.C.G.S. § 15A-2002 (1997). The trial court did instruct the jurors that "if you recommend a sentence of life imprisonment, the Court will impose a sentence of life imprisonment without parole." Defendant's trial counsel argued to the jury:

> [W]e're not kidding you about life in prison and life without parole. . . . That's what this law says. That's what the [G]eneral [A]ssembly says life without parole means, and that's what his Honor is going to tell you life in prison is, life without parole.

The jury thus was properly informed of the law regarding parole eligibility for defendants sentenced to life imprisonment.

The jurors in *Robinson* and *Quesinberry* did not receive such an instruction because they were instructed under our previous capital sentencing scheme in which a defendant sentenced to life was eligible for parole consideration after twenty years. *See* N.C.G.S. § 15A-1371(a1) (1983) (repealed by Act of Mar. 23, 1994, ch. 21, sec. 3, 1994 N.C. Sess. Laws 59, 60). In the absence of an instruction regarding parole ineligibility, such as the one given in this case, it is to be expected that "[m]ost jurors, through their own experience and common knowledge, know that a life sentence does not necessarily mean that the defendant will remain in prison for the rest of his life." *Quesinberry*, 325 N.C. at 135-36, 381 S.E.2d at 688. Once the jury has been instructed that life imprisonment means life without parole, however, we presume that the jury listens closely to the instruction, strives to understand and follow it, and does not believe the trial court is misinforming it as to the law. *State v. Neal*, 346 N.C. 608, 618, 487 S.E.2d 734, 740 (1997).

We have held that a trial court does not err by refusing to allow *voir dire* concerning prospective jurors' conceptions of the parole eligibility of a defendant serving a life sentence. *See State v.*

*Chandler*, 342 N.C. 742, 749, 467 S.E.2d 636, 640, *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 133 (1996); *State v. Skipper*, 337 N.C. 1, 24, 446 S.E.2d 252, 264 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). This issue was recently decided contrary to defendant's position in *Neal*, a case involving our current capital sentencing scheme under which defendant here was sentenced. *Neal*, 346 N.C. at 617-18, 487 S.E.2d at 739-40. We find no reason to revisit our prior holdings on this issue. This assignment of error is overruled.

[2] Defendant next argues that the trial court erred by ordering disclosure of defendant's medical records from jail. He contends this order violated his physician-patient privilege.

This privilege has no common law predecessor; it is entirely a creature of statute. *State v. Martin*, 182 N.C. 846, 849, 109 S.E. 74, 76 (1921). The governing statute provides, in pertinent part:

> No person, duly authorized to practice physic or surgery, shall be required to disclose any information which he may have acquired in attending a patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician . . . . Confidential information obtained in medical records shall be furnished only on the authorization of the patient . . . . *Any resident or presiding judge . . . may . . . compel disclosure if in his opinion disclosure is necessary to a proper administration of justice.*

N.C.G.S. § 8-53 (1986) (emphasis added). The decision that disclosure is necessary to a proper administration of justice "is one made in the discretion of the trial judge, and the defendant must show an abuse of discretion in order to successfully challenge the ruling." *State v. Drdak*, 330 N.C. 587, 592, 411 S.E.2d 604, 607 (1992). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Wilson*, 313 N.C. 516, 538, 330 S.E.2d 450, 465 (1985).

Defendant does not argue that the trial court abused its discretion in ordering the medical records disclosed but rather that it failed to specifically find that disclosure was necessary to a proper administration of justice. N.C.G.S. § 8-53 does not require such an explicit finding. The finding is implicit in the admission of the evidence.

Defendant sought to suppress statements he made to the police while in jail by arguing that he was suffering from controlled sub-

stance withdrawal symptoms and would therefore have been in no condition mentally to give statements to the police. Defendant thus placed at issue his state of mind during the time he was in jail, and the State properly sought to rebut that evidence with his medical records from jail. Defendant makes no argument, and we perceive no reason to believe, that the trial court abused its discretion in ordering the medical records disclosed. This assignment of error is overruled.

[3] Defendant next argues the trial court erred by denying his challenge to the State's peremptory strike of one black prospective juror. Defendant argued to the trial court that the strike was racially motivated, in violation of the equal protection principles recognized in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986). The trial court ruled that defendant had not made the requisite *prima facie* showing of purposeful racial discrimination. *Id.* at 96, 90 L. Ed. 2d at 87-88. We agree.

> A three-step process has been established for evaluating claims of racial discrimination in the prosecution's use of peremptory challenges. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). First, defendant must establish a *prima facie* case that the peremptory challenge was exercised on the basis of race. *Id.* Second, if such a showing is made, the burden shifts to the prosecutor to offer a racially neutral explanation to rebut defendant's *prima facie* case. *Id.* Third, the trial court must determine whether the defendant has proven purposeful discrimination. *Id.*

*State v. Cummings*, 346 N.C. 291, 307-08, 488 S.E.2d 550, 560 (1997). Defendant has shown only that he is black and that the State peremptorily struck one black prospective juror. This is insufficient to establish a *prima facie* case of racial discrimination. *See State v. Quick*, 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995) (concluding the State's peremptory excusal of two of four black prospective jurors was insufficient to establish a *prima facie* case); *State v. Ross*, 338 N.C. 280, 286, 449 S.E.2d 556, 561 (1994) ("The mere facts that defendant is a member of a cognizable racial group and that the prosecutor used one peremptory challenge to exclude a member of defendant's race do not raise the necessary inference of discrimination on account of the juror's race.").

[4] The prosecutor and the trial court mentioned the following race-neutral reasons as possibly supporting the State's peremptory strike: (1) this venireman had been arrested for assault on a female; (2)

defense counsel had once represented this venireman in a traffic matter; (3) this venireman indicated that he had a bachelor's degree in psychology, and there would be psychological testimony in this case; and (4) a Hispanic venireman had already been accepted for jury duty. Defendant argues that when the State provides race-neutral reasons for its peremptory strike, the *prima facie* case inquiry becomes moot under this Court's analysis in *Cummings*, 346 N.C. 291, 488 S.E.2d 550. We disagree. While in *Cummings* we examined the race-neutral reasons the State volunteered after the trial court had found no *prima facie* showing of purposeful discrimination, *id.* at 308-10, 488 S.E.2d at 560-62, it was not necessary to do so. Because we hold that the trial court correctly ruled that defendant failed to make a *prima facie* showing of racial discrimination, we need not examine the validity of any race-neutral reasons for the challenge. This assignment of error is overruled.

**[5]** Defendant next assigns error to the trial court's refusal to instruct the jury as to second-degree murder with regard to one victim and attempted second-degree murder with regard to another. Murder in the first degree, the crime of which defendant was convicted, is the "intentional and unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Fisher*, 318 N.C. 512, 517, 350 S.E.2d 334, 337 (1986). Murder in the second degree is the unlawful killing of a human being with malice but without premeditation and deliberation. *State v. Brown*, 300 N.C. 731, 735, 268 S.E.2d 201, 204 (1980). A defendant charged with first-degree murder based on premeditation and deliberation is entitled to an instruction on second-degree murder only if the evidence, reasonably construed, tended to show a lack of premeditation and deliberation or if it would permit a jury rationally to find the defendant guilty of second-degree murder while acquitting him of first-degree murder. *State v. Morston*, 336 N.C. 381, 402, 445 S.E.2d 1, 13 (1994).

Defendant notes that the trial testimony of two law enforcement officers regarding defendant's custodial statements revealed that he claimed he had set the fire as a "prank." He argues that this is affirmative evidence of his lack of premeditation and deliberation, thus entitling him to an instruction on second-degree murder and attempted second-degree murder. We disagree.

The evidence, reasonably construed, indicates that defendant burned the apartment building in an attempt to eliminate witnesses who might be able to testify against him regarding mail theft. Defendant himself told a law enforcement officer that he became

STATE v. SMITH

[347 N.C. 453 (1998)]

concerned about the mail theft being traced to him, so he and a companion decided to burn the building. The two men drove by the building late at night to observe the area, bought kerosene, and then drove around before returning between two and three in the morning when most of the tenants would be at home and asleep. Defendant admitted that he poured kerosene directly in front of the apartment door of the woman whose credit card number he had stolen, the one witness necessary to convict him of his crime. When the kerosene did not ignite, he splashed it up the stairs and into the upper stairwell and succeeded in igniting it.

In light of these facts, defendant's self-serving statement that he set the fire as a prank was not sufficient to support an instruction on second-degree murder. Any reasonable construction of the evidence indicates that the murder was both premeditated and deliberate. No rational jury could have found defendant guilty of second-degree murder while acquitting him of first-degree murder, or guilty of attempted second-degree murder while acquitting him of attempted first-degree murder. This assignment of error is overruled.

[6] Defendant next argues that the trial court erred by allowing improper conduct by the State during the cross-examination of one of defendant's witnesses as well as during the State's closing arguments in both the guilt/innocence and penalty phases. Defendant's first complaint involves the State's cross-examination of one of defendant's expert witnesses. During cross-examination Dr. Pete Sansbury testified that he had not medicated defendant during his incarceration because it would have interfered with diagnosis and was not necessary because defendant had not had problems with violence. The following exchange then took place:

Q: You didn't hear that he beat up Richard Jackson or tried to rape him or anything like that?

MR. AUMAN [defense counsel]: Objection.

COURT: Sustained.

MR. AUMAN: Motion to strike.

COURT: Don't consider that question just asked by the assistant district attorney.

Any improper conduct by the State during this exchange was corrected by the trial court's prompt curative instructions. *See State v. Sparrow*, 276 N.C. 499, 514, 173 S.E.2d 897, 907 (1970).

STATE v. SMITH

[347 N.C. 453 (1998)]

**[7]** Defendant next complains about the State's later questioning of this witness. Referring to an intelligence test administered to defendant, the State asked the witness about several of the individual test questions. Among these the State asked about a question that read, "If you buy six dollars' worth of gasoline and pay for it with a ten-dollar bill, how much change should you get back?" The witness affirmed that this question was in the test, and the State then asked, "He knew that one, didn't he?" Defendant contends that the State asked this question only for the rhetorical purpose of alluding to defendant's purchase of the kerosene with which he set the fire. Defendant argues this was improper behavior similar to that criticized by this Court in *State v. Sanderson*, 336 N.C. 1, 442 S.E.2d 33 (1994).

In *Sanderson* this Court addressed a situation in which the prosecutor engaged in improper conduct throughout the sentencing proceeding. *Id.* at 7, 442 S.E.2d at 37. With regard to the prosecutor's cross-examination of the defendant's expert witness, we observed that "[h]e insulted her, degraded her, and attempted to distort her testimony," *id.* at 11, 442 S.E.2d at 40, and that he "maligned, continually interrupted and bullied" her, *id.* at 15, 442 S.E.2d at 41. The questions here do not at all resemble the prosecutorial conduct condemned in *Sanderson*. The trial court did not err by allowing the questioning complained of here.

**[8]** Defendant next complains of a single statement made during the State's closing argument. In describing the evidence presented to prove premeditation and deliberation, the State referred to a videotape from the convenience store showing defendant calmly purchasing kerosene. The State then told the jury, "This is one of the better cases, ladies and gentlemen, that any jury in Buncombe County will ever see. You can see premeditation and deliberation." Defendant argues this was an improper argument which asked the jury to rely on the prosecutor's judgment as an expert. Defendant did not, however, object to this argument at trial.

"In deciding whether the trial court improperly failed to intervene *ex mero motu* to correct an allegedly improper argument of counsel at final argument, our review is limited to discerning whether the statements were so grossly improper that the trial judge abused his discretion in failing to intervene." *State v. Holder*, 331 N.C. 462, 489, 418 S.E.2d 197, 212 (1992). Viewed in context, the State's argument appears to focus on the unique evidence of premeditation and deliberation presented here, a videotape that the jury could actually see,

rather than the prosecutor's judgment about that evidence. The State's argument was not, in any event, so grossly improper as to require intervention *ex mero motu* by the trial court.

Defendant next complains of three arguments made in the State's final summation during the penalty phase. Again, defendant failed to object to any of these arguments at trial; thus, we review the trial court's failure to intervene *ex mero motu* for an abuse of discretion. *Id.*

[9] First, defendant argues that the State made improper reference to another person murdered by defendant, a person whose murder was not charged here. At two points during the State's final summation, the prosecutor referred to Kelli Froemke, a woman whom defendant raped, murdered, and burned less than one month after committing the crimes at issue here. Defendant contends these references amounted to improperly asking the jury to sentence defendant to death for a crime for which he was not being tried. Evidence concerning the murder of Kelli Froemke and the burning of her apartment building was properly admitted during the sentencing phase to support the (e)(11) aggravating circumstance that the murder in this case was part of a course of conduct including other crimes of violence against other persons. N.C.G.S. § 15A-2000(e)(11) (1997). The State was entitled to argue to the jury that defendant deserved the death penalty based on the evidence supporting this aggravating circumstance. The trial court did not err by allowing the State to refer to defendant's other victim.

[10] Second, defendant contends the following argument by the State denigrated defendant's exercise of his constitutional rights to trial, to counsel, and to due process of law:

> Now we're getting to the justice part. This is where we get to the justice part. This is the law in civilized society in Buncombe County and the state of North Carolina, in Asheville, North Carolina. This is due process. You have sat here, you have watched it. You have watched due process. We have our trials; we have them during the daytime. Anybody can come and watch. That's due process. Anybody can call anybody they want as a witness. They can cross-examine anyone they want. Don't you think that "Phillip" Cotton and Erin [Conklin] and Alison Kafer would have liked just a little bit of due process? But no. Your due process is you can hang out a window or suffocate or you can burn up . . ., and you've got two seconds to decide. You

have a few moments to decide. That's the due process that they were given.

Any denigration of defendant's constitutional rights that may be implied from this argument was not so grossly improper as to require intervention *ex mero motu* by the trial court.

**[11]** Finally, defendant argues that the State improperly argued to the jury that if defendant were sentenced to life in prison, he would spend his time comfortably doing things such as playing basketball, lifting weights, and watching television. Defendant concedes that this Court has rejected a similar argument in *State v. Alston*, 341 N.C. 198, 251-52, 461 S.E.2d 687, 716-17 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 100 (1996). Here, as in *Alston*, the State's argument "served to emphasize the State's position that the defendant deserved the penalty of death rather than a comfortable life in prison." *Id.* at 252, 461 S.E.2d at 717. The trial court did not abuse its discretion by failing to intervene *ex mero motu*. This assignment of error is overruled.

**[12]** Defendant next contends that the trial court erred by submitting both the (e)(5) aggravating circumstance, that the murder was committed while defendant was engaged in arson, and the (e)(10) aggravating circumstance, that defendant knowingly created a great risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more than one person. Defendant argues it was impermissibly duplicative to submit both circumstances because both were based on the fact that defendant committed the murder by means of arson. While generally the same evidence may not be used to support more than one aggravating circumstance, *State v. Goodman*, 298 N.C. 1, 29, 257 S.E.2d 569, 587 (1979), this Court has held it permissible to use the same evidence to support multiple aggravating circumstances when the circumstances are directed at different aspects of a defendant's character or the murder for which he is to be punished. *State v. Hutchins*, 303 N.C. 321, 354, 279 S.E.2d 788, 808 (1981).

Defendant argues that this case is similar to *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987), in which this Court held it error to submit both the (e)(5) aggravating circumstance, that the defendant committed the murder while engaged in the commission of a robbery, and the (e)(6) aggravating circumstance, that the murder was committed for pecuniary gain. *Id.* at 236, 354 S.E.2d at 451. In *Quesinberry*, given the particular facts of that case, this Court was not persuaded that the (e)(6) circumstance, which addressed the

pecuniary gain *motive* of the murder, truly differed from the (e)(5) circumstance, which addressed the *act* of armed robbery. The Court observed that "[t]he facts of this case . . . reveal that defendant murdered the shopkeeper for the single purpose of pecuniary gain by means of committing an armed robbery." *Id.* at 238, 354 S.E.2d at 452. The Court then noted that "[n]ot only is it illogical to divorce the motive from the act under the facts of this case, but the same evidence underlies proof of both factors." *Id.* at 239, 354 S.E.2d at 452. Finally, in holding it error to submit both circumstances, the Court observed that

> in the particular context of a premeditated and deliberate robbery-murder where evidence is presented that the robbery was attempted or effectuated for pecuniary gain, the submission of both the aggravating factors enumerated at N.C.G.S. 15A-2000(e)(5) and (6) is redundant and . . . one should be regarded as surplusage.

*Id.* at 239, 354 S.E.2d at 453.

This case differs from *Quesinberry*, however. While in *Quesinberry* the pecuniary gain *motive* could not be logically separated from the *act* of armed robbery, in this case the (e)(5) circumstance addresses a different aspect of defendant's crime than does the (e)(10) circumstance. The (e)(5) circumstance is considered aggravating because it addresses the fact that defendant committed the murder while engaging in another felony, arson. The (e)(10) circumstance, that defendant knowingly created a great risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more than one person, on the other hand, addresses more than the fact that defendant committed murder while perpetrating another felony. This circumstance speaks to a distinct aspect of defendant's character, that he not only intended to kill a particular person when he set fire to the apartment building, but that he disregarded the value of every human life in the building by using an accelerant to set the fire in the middle of the night. This aspect of defendant's character and actions is not fully captured by the (e)(5) circumstance, though both rely on the same evidence. Therefore, it was not error for the trial court to submit both circumstances. This assignment of error is overruled.

**[13]** Defendant next argues that the trial court erred by submitting to the jury the (f)(1) mitigating circumstance, that defendant had no significant history of prior criminal activity. Defendant notes that he

requested that the trial court not submit this circumstance because the evidence showed that he had a history of illegal drug use, had committed the crimes of breaking and entering and larceny, had pled guilty to another arson, and had previously been in prison. Defendant contends that no reasonable juror could have found this not to be a significant history of prior criminal activity, thus making it error for the trial court to submit the circumstance.

The statute governing capital sentencing proceedings provides, in pertinent part:

> In all cases in which the death penalty may be authorized, the judge *shall include* in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsections (e) and (f) *which may be supported by the evidence* . . . .

N.C.G.S. § 15A-2000(b) (emphasis added). This Court has explained the law regarding submission of the (f)(1) mitigating circumstance as follows:

> The trial court is required to determine whether the evidence will support a rational jury finding that a defendant has no significant history of prior criminal activity. *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988). If so, the trial court has no discretion; the statutory mitigating circumstance must be submitted to the jury, without regard to the wishes of the State or the defendant. *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316, *vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988).

*State v. Mahaley*, 332 N.C. 583, 597, 423 S.E.2d 58, 66 (1992), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 649 (1995). "We have also recognized that common sense, fundamental fairness, and judicial economy require that any reasonable doubt regarding the submission of a statutory or requested mitigating factor be resolved in favor of the defendant." *State v. Brown*, 315 N.C. 40, 62, 337 S.E.2d 808, 825 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988).

We held, in a case with similar facts, that assuming *arguendo* that it was error to submit the (f)(1) circumstance, it was not prejudicial to the defendant. *State v. Walker*, 343 N.C. 216, 222-24, 469 S.E.2d 919, 922-23 (defendant had an attempted second-degree mur-

der conviction and a history of illegal drug dealing), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 180 (1996). We stated that "[a]bsent extraordinary facts not present in this case, the erroneous submission of a mitigating circumstance is harmless." *Id.* at 223, 469 S.E.2d at 923. There are no extraordinary facts present that meaningfully distinguish this case from *Walker*. The State did not violate the *Walker* proscription against arguing to the jury that defendant had requested this mitigating circumstance when he in fact had objected to it. *See id.* Accordingly, following *Walker*, we hold that the trial court did not err to defendant's prejudice by submitting the (f)(1) mitigating circumstance over his objection.

For the same reasons, we reject defendant's argument that even if a reasonable juror could have found that defendant had no significant prior criminal history, it was nevertheless a violation of defendant's federal constitutional right to effective assistance of counsel for the trial court to submit this circumstance over defendant's objection. There are no "extraordinary facts" present that establish harm to defendant from the submission of this mitigating circumstance. *Id.* This assignment of error is overruled.

**[14]** In his next assignment of error, defendant contends that the "Issues and Recommendations as to Punishment" form submitted to the jury was unconstitutional. Defendant argues that this form, in violation of *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), required unanimity from jurors in order to find the (f)(9) statutory catchall mitigating circumstance. This argument lacks merit.

The form clearly explained that the jurors should consider whether "[o]ne or more of us finds [the catchall] mitigating circumstance to exist." Further, the trial court properly instructed the jury on this mitigating circumstance as follows:

> If any one or more of you find [the catchall mitigating circumstance], by a preponderance of the evidence, you would so indicate by having your foreperson write "yes" in the space provided after this mitigating circumstance on the "Issues and Recommendation" form. And if none of you find any such circumstance to exist, then you would so indicate by writing "no" in that space, and there are lines provided after that if you care to articulate what that circumstance or circumstances may be, any one or more of you. If you do not care to, then you don't have to insert anything.

Both the form and the instruction explaining it made clear that the jury should find the circumstance if "one or more" of the jurors found it to exist. Neither required jury unanimity. This assignment of error is overruled.

Defendant next raises two issues which he concedes this Court has decided against his position: (1) that the trial court violated his constitutional rights when it instructed the jury that it need not consider nonstatutory mitigators unless it found that those circumstances had mitigating value, and (2) that the trial court's instruction giving jurors discretion to consider mitigation under sentencing Issues Three and Four was unconstitutional. We have reviewed defendant's arguments, and we find no compelling reason to reconsider our prior holdings. These assignments are overruled.

Having found no error in either the guilt/innocence phase of defendant's trial or the capital sentencing proceeding, we are required to review the record and determine: (1) whether the evidence supports the aggravating circumstances found by the jury; (2) whether passion, prejudice, or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) whether the sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). We conclude that the record fully supports the aggravating circumstances found by the jury. Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We defined the pool of cases for proportionality review in *State v. Williams,* 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied,* 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon,* 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied,* 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). We compare the instant case to others in the pool that "are roughly similar with regard to the crime and the defendant." *State v. Lawson,* 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied,* 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether

the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

[15] This Court has determined that the sentence of death was disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 573-74, 364 S.E.2d 373, 375 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). In our proportionality review, it is proper to compare the present case to those cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). We find the instant case distinguishable from each of the seven cases in which we found the death penalty to be disproportionate. In none of those cases did the jury find the existence of five statutory aggravating circumstances. Here, the jury found each of the five aggravating circumstances submitted to it, including: (1) that defendant had been previously convicted of a felony involving the threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) that defendant committed this murder for the purpose of avoiding lawful arrest, N.C.G.S. § 15A-2000(e)(4); (3) that defendant committed this murder while engaged in first-degree arson, N.C.G.S. § 15A-2000(e)(5); (4) that defendant knowingly created a great risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more than one person, N.C.G.S. § 15A-2000(e)(10); and (5) that the murder was part of a course of conduct in which defendant committed crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11).

Further, multiple aggravating circumstances were found to exist in only two of the disproportionate cases, *Bondurant* and *Young*. Both of these cases are distinguishable from the instant case. In *Young* this Court focused on the failure of the jury to find the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance. *Young*, 312 N.C. at 691, 325 S.E.2d at 194. Here, the jury found each aggravating circumstance submitted to it. In *Bondurant*

STONE v. N.C. DEPT. OF LABOR

[347 N.C. 473 (1998)]

this Court emphasized that immediately after defendant's senseless act of murder, defendant exhibited a concern for the victim's life and remorse for his action by seeking assistance for the victim. *Bondurant*, 309 N.C. at 694, 309 S.E.2d at 182-83. Here, defendant demonstrated no such concern or remorse. He saw Grace Apartments in flames but never called the fire department. Further, he admitted to setting additional fires. For the foregoing reasons, we conclude that each case where this Court has found a sentence of death disproportionate is distinguishable from this case.

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id*. It suffices to say here that we conclude that the present case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

Finally, we noted in *State v. Daniels*, 337 N.C. 243, 446 S.E.2d 298 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995), that similarity of cases is not the last word on the subject of proportionality. *Id*. at 287, 446 S.E.2d at 325. Similarity "merely serves as an initial point of inquiry." *Id*.; *see also Green*, 336 N.C. at 198, 443 S.E.2d at 46-47. The issue of whether the death penalty is proportionate in a particular case ultimately rests "on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators, and other circumstances." *Daniels*, 337 N.C. at 287, 446 S.E.2d at 325.

We cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that the defendant received a fair trial on the charge of first-degree murder and a fair capital sentencing proceeding, free from prejudicial error.

NO ERROR.